[833] Garwood

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-8438
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALFONSO MORA, JESUS MEDINA,
JUAN TORRES SOSA and RICARDO REYES LIRA,

Defendants-Appellants.

_____

Appeal from the United States District Court for the
Western District of Texas
_____

( )

Before GOLDBERG, GARWOOD and WIENER, Circuit Judges.

GARWOOD, Circuit Judge:

Challenging their convictions for drug-related offenses, defendants-appellants Alfonso Mora (Mora), Jesus Medina (Medina), Ricardo Reyes Lira (Lira), and Juan Torres Sosa (Sosa) raise issues of, *inter alia*, entrapment, discovery abuse, and sufficiency of the evidence. Mora and Medina contest the district court's assessment of their sentences, disputing its findings on the amount of marihuana involved in the offense conduct. We affirm.

## Facts and Proceedings Below

Defendants' convictions arise out of a sting operation conducted by the Drug Enforcement Administration (DEA) in El Paso, Texas, on March 5, 1992. Shortly before noon on that day, Special Agent Jack Geller (Geller) of the DEA, acting in an undercover capacity, met with Medina and Mora at a Carrows Restaurant in El Paso to negotiate the purchase and delivery of approximately five hundred pounds of marihuana.

Geller arrived at the restaurant with Roger Russell (Russell), a confidential informant for the DEA who had introduced him to Medina in connection with an earlier marihuana transaction which had fallen through.[1] Medina was accompanied by Mora, whom Geller had not met before. Upon his arrival, Medina took Geller to one side to apologize for not carrying through with the earlier transaction. Medina then introduced Geller to Mora. The four men, Geller, Russell, Medina, and Mora, discussed the mechanics of the anticipated delivery. Geller offered to provide a vehicle, a Ryder van, to make the exchange: the defendants were to take the vehicle, load it with marihuana, and return it to Geller at a specified time and place. During this conversation, Medina told Geller that he had seen three thousand pounds of marihuana at the warehouse which was his source of supply. Medina arranged to meet Geller again at the Carrows Restaurant at approximately 3:00 that afternoon to exchange the vehicles; his people did not leave work

---

[1] On February 25, 1992, Geller met with Medina to arrange the purchase of six hundred pounds of marihuana from Medina. This exchange did not occur, however, because, according to Russell, Medina was unable to acquire the marihuana from his source.

2

until that time. Geller gave Medina his pager number in case of delay.

As planned, Geller met Medina and Mora at the Carrows Restaurant that afternoon; Russell was not present at this meeting. Medina informed Geller that his people could not leave work yet. When Geller hinted at backing out of the transaction, Mora insisted that they continue with it. Geller gave Medina the keys to the Ryder van, and Mora tried them out to ensure that they worked. Geller and Medina, in Mora's presence, agreed upon the place for the transfer of the marihuana and the money; Medina drew a map for Geller, who was posing as a buyer from out of town.

Around 5:00 that afternoon, Medina called Geller's pager, leaving the phone number of a pay phone at a Diamond Shamrock station. When Geller returned his call, Medina told him that the transaction was still on, but that his people were experiencing further delays.

At 7:00 that evening, Russell called Geller to ask him to call Medina at the same number he had used earlier. When Geller reached Medina, Medina ensured him that the arrangement was still on but would be delayed still further. In addition, Medina wanted to change the structure of the transaction. Medina stated that rather than deliver the entire five hundred pounds of marihuana in a single exchange, his people insisted that he deliver only fifty pounds of marihuana at first; they would deliver the remaining four hundred fifty pounds after Geller paid for the first fifty. Geller was reluctant to split the delivery in that manner, and he and Medina agreed to discuss the problem in person at the Diamond

Shamrock station.

Geller met Medina at the station.  Medina informed him that the Mexican Federal Judicial Police owned the three thousand pounds of marihuana that he had mentioned at the first meeting at Carrows and that the Mexican Police wanted to deliver the marihuana in two parts.  At Geller's suggestion, Medina attempted to contact his source, but he was unable to reach them.  Geller refused to pay for fifty pounds of marihuana separately, before receiving the full five hundred pounds negotiated.  Finally, they agreed that Medina's people would deliver the fifty pounds, place it in Medina's Corvette, then deliver the remaining four hundred fifty pounds, whereupon Geller would pay for the entire shipment of five hundred pounds with a single payment.

Medina paged Geller again shortly before 9:00 that evening; when Geller returned the call, Medina instructed him to go to the Stadium Bar, a bar located in a strip shopping center.  When Geller arrived, Medina took him over to the Ryder van which was parked there and, indicating a box that was visible through the window of the van, told Geller that the box contained marihuana.  Medina entered the Stadium Bar and returned with Mora, who opened the van.  When Geller entered the van, he smelled marihuana and could see that the box contained small, flat bricks of marihuana.  Mora insisted that he pay for the fifty pounds before they would continue with the transaction.  When Geller realized that the remaining marihuana would not be delivered without prior payment

for the first fifty pounds, he gave the arrest signal.[2]

Surveillance conducted throughout the day revealed defendants' involvement in the transaction. El Paso Police Detectives Manuel Figueroa (Figueroa) and Luis Marquez (Marquez),[3] both working with the DEA Task Force, surveilled the meeting at Carrows and upon its conclusion followed Medina and Mora, who were in a white Volkswagen Rabbit.[4] Figueroa and Marquez dropped off their tail when Joe Zimmerly (Zimmerly), a detective for the El Paso Police Department, took over and followed Medina and Mora to the Best Buy Tortilla Factory. Zimmerly observed Medina enter the factory and return about five minutes later. Evidence at trial showed that Sosa and Lira worked at that factory.

Figueroa and Marquez surveilled the 3:00 p.m. meeting at Carrows. After the meeting ended, they followed the Ryder van, which Mora was driving, to the shopping center where the Stadium

---

[2] Geller did not want to pay for the fifty pounds of marihuana for security reasons: the agents would have had to maintain surveillance over the money as well as continue to monitor the defendants' activities and provide protection for Geller as the undercover officer.

[3] We note that the Justice Department has informed us (and counsel for appellants), by letter dated April 23, 1993, that Detective Marquez "was recently indicted" for conspiring to possess a quantity of marihuana with the intent to distribute it, contrary to 21 U.S.C. §§ 841 and 846. There is nothing to demonstrate that his indictment affects resolution of the issues raised in this appeal. The April 23 letter observes that "to the extent that any of the defendants believe that the newly discovered evidence affects the judgments below, it would be appropriate for a motion to be brought in the first instance in the district court under Federal Rule of Criminal Procedure 33." None of the appellants have filed any response in this Court to the Justice Department's April 23 letter.

[4] Several times later in the day, the agents spotted the Rabbit parked at Medina's residence at 11803 Prado Del Sol.

Bar is located. Later in the afternoon, the agents saw Mora and Medina near Medina's house on Prado Del Sol in the white Volkswagen Rabbit.

Around 6:00 p.m., Figueroa and Marquez noticed a white Ford pickup truck arrive at Medina's house; two men got out and went inside the house. The truck was registered to Lira's wife. The men in the pickup truck left and came back after a short time. Around 6:30 p.m., the men left again in the white Ford pickup truck; the agents followed the truck to a Good Time store where they observed a man later identified as defendant Sosa making a telephone call. Around the same time, the detectives saw Medina leaving his house in a blue Corvette; they followed him to the Good Time store where Medina got out and met with Sosa.

About 7:10 that evening, Zimmerly, who had been watching the Ryder van for about four hours that afternoon and evening, saw the white Ford pickup park behind the van. He could not identify the occupants. He observed a person get out of the pickup truck and drive off in the van. Zimmerly followed the van until other agents took over the surveillance. He later drove by the parked van and observed a meeting of two men by the van about 7:35 p.m.

Ron Ayers, a Special Agent with the Immigration Service attached to the DEA Task Force, began his involvement with the surveillance of the defendants around 6:00 in the evening. At 8:30 p.m., Ayers relieved another surveillance team watching the van. He saw a gray pickup truck pull up behind the van. One defendant, later identified by Ayers as Mora, was in the van; two other men were in the gray pickup truck. When Ayers had established his

6

surveillance position, the three men were standing between the van and the pickup truck. One man stood between the bumpers and looked around, one opened the side door of the van, and the third went to the pickup truck and took something from the front seat. The third man walked to the van and put the object he was carrying inside the van and closed its door. The men met once again between the vehicles. One man got back in the van and drove off; the other two men got into the pickup, waited for a few minutes, and then followed the van.

Ayers followed the vehicles, attempting to get the license plate number of the gray pickup truck. At a stoplight, he was able to identify Mora as the driver of the van. Agents maintained constant surveillance of the vehicles until they reached the parking lot of the shopping center. Ayers briefly broke off surveillance trying to set up in the parking lot. As he monitored radio traffic, he saw Lira and Sosa walking back to the pickup truck and position themselves at an angle looking toward where Mora had parked the van. Ayers testified that he knew the identities of the men who met in the parking lot to load the box with marihuana in the van, not because he could see them clearly at the time, but because he saw Mora at the stoplight and later saw Lira and Sosa exit the pickup truck and because he and other agents maintained continuous surveillance from the time the men met and loaded the box into the van until the time they got to the shopping center.

Figueroa and Marquez were also present at the Stadium Bar to provide support for the exchange. When Geller gave the arrest signal, Figueroa and Marquez moved in and arrested the men who were

7

in the gray pickup that had followed the van to the location; the pickup truck was registered to Sosa's wife. Figueroa arrested Sosa, who was in the driver's position in the pickup truck. Marquez arrested Lira, the other occupant of the gray pickup truck. Following the arrest, Figueroa glanced inside the pickup truck and noticed a weapon underneath the edge of the seat, as though it had fallen forward. The weapon was a loaded 22-caliber semiautomatic hand gun. No fingerprints were lifted from the gun.

Approximately fifty-two pounds of marihuana were seized from the van.

All four defendants were indicted on two counts: (1) conspiracy to possess, with intent to distribute, marihuana; and (2) possession and aiding and abetting the possession of marihuana with intent to distribute it. 21 U.S.C. §§ 841, 846. In addition, Sosa was charged in count three with the use of a firearm during and in relation to a drug trafficking crime. 18 U.S.C. § 924(c)(1). The government gave notice of its intent to seek an enhanced penalty for conspiracy to possess with intent to distribute more than one hundred kilograms of marihuana.

The defendants were convicted of all counts, as charged, in a two-day jury trial, which concluded July 2, 1992. A presentence report (PSR) was prepared for each defendant. The probation officers preparing the reports applied the enhanced penalty provisions to Medina and Mora, on the grounds that those two defendants participated in the negotiations for the delivery of five hundred pounds of marihuana. The probation officers concluded, however, that Sosa and Lira could be held responsible

8

only for the fifty-two pounds actually delivered, as there was insufficient evidence to demonstrate their active participation in the negotiations for the larger amount. The resulting base offense levels calculated under the United States Sentencing Guidelines were 26 for Medina and Mora, and 18 for Sosa and Lira.[5] The district court denied defendants' objections to the PSRs and sentenced them in accordance with the recommendations of the probation officers.

### Discussion

On appeal, Medina and Mora challenge their convictions on the grounds that the government failed to provide them proper discovery material. They also claim that they were deprived of a fair trial by the government's failure to produce the confidential informant for trial, that they were the victims of outrageous government conduct, and that they were entrapped. Finally, they contend that the district court erred in sentencing them based upon five hundred pounds of marihuana rather than the fifty pounds which were actually delivered.

Sosa and Lira contest the sufficiency of the evidence supporting their convictions for conspiracy and possession of marihuana; in addition, Sosa challenges the sufficiency of the

---

[5]     No adjustments were made for either Medina or Mora; their offense levels were 26, with criminal history categories of I. Sosa's base offense level was lowered by two points for a minor role in the offense, and by a further two levels for acceptance of responsibility, yielding a base offense level of 14 and a criminal history category of III. Lira's base offense level was raised two levels due to the presence of the gun found in the pickup; this increase was negated by a decrease of two levels for a minor role in the offense. Lira's resulting offense level was 18, with a criminal history category of IV.

evidence supporting his firearm conviction and joins Medina and Mora in complaining of discovery abuse by the government.

I.   The Confidential Informant

Because several of the defendants' claims on appeal stem from the involvement in the investigation of Russell, the confidential informant, some background information concerning Russell's connections with the defendants and the DEA is appropriate.

Russell and Medina were acquainted prior to the onstart of the DEA investigation. Medina worked for an insurance company and established a business relationship with Russell, who ran a business which provided medical reports for insurance companies. The two men later developed a social relationship.

According to Medina, who testified at trial, in return for some help with veterans benefits, Russell asked Medina to help him out with some financial problems by participating in some drug transactions. Medina testified that Russell confronted him three times in December 1991 and began to use threats to force him to sell drugs.[6] Russell told Medina about a millionaire friend in Dallas who was a drug kingpin, who would send someone to kill Medina if he did not cooperate. Medina asked Mora, who was his roommate at that time, to listen in on the conversations when Russell came by the house and threatened him. Medina also testified that when he refused to answer the pager Russell had

_____

[6]    Medina testified that Russell told him he knew too much, saying, "Look, Jessie, you better think about what I'm doing, because if you don't things could get really nasty for you." Other threats included: "Jesse, I can get you taken care of," and "I will have you killed."

10

given him, Russell sent an employee to Medina's house to warn him to answer the pages.

Medina and Mora attempted to establish at trial that, although they were not predisposed to commit any offense, Russell had threatened them into participating in marihuana trafficking in order to solve his financial problems. They alleged that Russell was to be paid a percentage of the value of any property seized during the investigations for which he was the confidential informant, and that he pressured them into participating in the transaction and tried to ensure that the transaction entailed a large amount of marihuana in order to reap the largest profit possible.[7]

II.  Entrapment

On the strength of the above evidence, adduced primarily through their own testimony, Medina and Mora claim that they established the defense of entrapment as a matter of law. The government did not attempt to directly counter the defendants' testimony, and Russell was not present at trial to give his side of the story. The jury, which was fully charged on entrapment, rejected the defense and found defendants guilty.

---

[7]  Detective Figueroa, who as the case agent in this investigation was in charge of Russell, did not remember telling Russell that he would receive a percentage of any property seized, although he acknowledged that such an arrangement was possible in some situations. Detective Marquez testified that he never told Russell that he would be paid ten percent of anything seized. According to Figueroa, as well as documents provided to the district court by the government, Russell was paid a total of $600 for his work with this investigation.

Figueroa instructed Russell in the basics of being a confidential informant. He also told Russell he could not break any laws, and Russell signed a document to this effect.

11

Because the jury did not accept their defense, we review this claim under the same standard as that which applies to the sufficiency of the evidence. *See United States v. Morris*, 974 F.2d 587, 588 (5th Cir. 1992).

The entrapment defense involves an analysis of two factors: (1) inducement by the government; and (2) the defendants' predisposition, before any contact with government agents, to commit the crime charged. *United States v. Arditti*, 955 F.2d 331, 342 (5th Cir.), *cert. denied*, 113 S.Ct. 597 (1992). Although the government has the burden of proving that the defendants were predisposed to commit the offense, the defendants must first make a *prima facie* showing of entrapment by presenting some evidence that actions by the government created a substantial risk that an offense would be committed by a person not ready to commit it. *Id*. (quoting *United States v. Johnson*, 872 F.2d 612, 621 (5th Cir. 1989).

Generally speaking, a defendant's testimony cannot by itself establish entrapment as a matter of law because, absent unusual circumstances, the jury is almost always entitled to disbelieve that testimony. *Masciale v. United States*, 78 S.Ct. 827, 829 (1958) (jury was entitled to disbelieve defendant's uncontradicted testimony as to his persuasion by informant who did not testify; hence jury could reject entrapment defense even though raised by defendant's testimony). The jury was entitled to, and indeed apparently did, disbelieve Medina's and Mora's descriptions of Russell's behavior. Although the government did not introduce any evidence directly contradicting their story about Russell's

12

threats, there was other evidence which cast doubt on the defendants' credibility. Medina denied ever having any discussions with Agent Geller, which was contradicted by Geller's testimony. And, Medina's testimony exculpating Sosa and Lira was contradicted by a wealth of circumstantial evidence. Mora and Medina contradicted each other as to whether Medina discussed delivery of marihuana with Geller. Moreover, neither Medina nor Mora, who is Medina's cousin, went to the police about the threats by Russell, even though Medina's brother is a chief of police in New Mexico. The evidence revealed that Medina had the ability to procure marihuana on his own from suppliers of considerable quantity. In addition, Russell and Medina were acquainted prior to the onstart of the investigation; Russell did not initiate their relationship in connection with his role as a confidential informant. Further, neither Medina nor Mora ever expressed any reservations to Geller about the transaction or Russell. On one occasion when Medina was under the impression that Geller was mad at him, Geller reassured him that everything was fine.[8] When Geller mentioned not going through with the transaction, Mora urged him to continue.

---

[8] During one of the phone calls between Medina and Geller on March 5, Medina told Geller:

> "`Why are you so mad?  Why are you so -- why are you so pissed off at me?'  I said, `I don't know what you're talking about.'  He said, `Roger' -- referring to Roger Russell -- `called and said that you were all pissed at me and you're all mad about something.'  I said, `I haven't even talked to him.  I have no idea what you're talking about.  I'm not mad.' . . . I remember telling him, `Why would I be mad?  In fact, I'm happy that you called because you're letting me know what's going on, so I'm not mad at all at you.  Just ignore what he says to you.'"

The active, enthusiastic participation on the part of the defendants is enough to allow the jury to find predisposition. *See United States v. Hudson*, 982 F.2d 160, 162 (5th Cir. 1993), *petition for cert. filed*, (April 21, 1993) ("It is well established that a defendant's enthusiasm for the crime can satisfy the predisposition requirement."); *Arditti*, 955 F.2d at 343 (willing and active participation, with no overwhelming evidence of serious resistance, sufficient to find predisposition); *United States v. Johnson*, 872 F.2d 612, 621 (5th Cir. 1989) (initiation of scheme by government did not preclude finding of predisposition where defendant took active and enthusiastic part in the plan).

At no time during the day of March 5th did Medina and Mora resist participating in the proposed transaction. Although they proposed changes in the mechanics of the delivery of the marihuana, they did not express any reluctance to procure the marihuana for Geller; indeed, Mora objected when the possibility arose that Geller would not continue with the transaction. When Medina contacted Geller concerning the delays he was experiencing with his people, he apologized for the wait and arranged new meeting times rather than taking advantage of the delays as an opportunity to withdraw. Moreover, when Geller would not assent to the proposed delivery of the marihuana in two stages, Medina met with him in person to try to reach an agreement, attempted to contact his source to discuss the problem with them, and eventually agreed to try a compromise proposed by Geller.

Faced with this evidence of participation, the jury could certainly reject the defendants' testimony (including that as to

14

Russell's threats) and find beyond a reasonable doubt that they were predisposed to commit the offenses.[9]

III. Discovery Claims

Medina, Mora, and Sosa complain that the government failed to comply with the discovery orders of the district court and disclose notes taken by government agents during conversations with Russell. The district court determined, after an *in camera* review, that the notes were not discoverable.[10]

The district court's decisions in overseeing the discovery process are entitled to great deference on appeal. Alleged errors are subject to review under an abuse of discretion standard; we will reverse only if the defendants establish prejudice to their substantial rights. *United States v. Singer*, 970 F.2d 1414, 1418 (5th Cir. 1992).

At the beginning of the proceedings in the district court, the court issued a standing discovery order directing the government to

---

[9] We also reject defendants' claims of outrageous government conduct. In order to establish such a claim, defendants must prove not only government overinvolvement in the charged crime, but also that they were *not* active participants in the criminal activity. *Arditti*, 955 F.2d at 343. Because there was overwhelming evidence, including their own admissions, of defendants' participation, the district court did not err in dismissing this claim.

[10] In its order denying defendants' motions for new trial, etc., the district court stated that

"the Government complied with the discovery orders in this case, although a more efficient and expeditious compliance is encouraged. However, the Government's conduct was not a `textbook example of outrageous government conduct' as Defendant JESUS [MEDINA] opines. Further, the Court reviewed, *in camera*, many materials before and during the course of the jury trial. Defendants received all essential discovery materials."

15

disclose all material required under FED. R. CRIM. P. 16, the Jencks Act (18 U.S.C. § 3500), and *Brady v. Maryland*, 83 S.Ct. 1194 (1963). Medina moved for additional discovery relating to Russell, the confidential informant. The motion was heard by a magistrate who granted defendant's request and ordered the government to deliver to Medina any documents concerning Russell, as well as information about law enforcement officers who had contact with Russell and material on Russell's prior criminal history. The government moved to modify the magistrate's order to restrict its scope to information concerning Russell's involvement with the instant case or with defendant Medina. The district court granted the government's motion and modified the magistrate's order accordingly. In considering the government's motion, the district court had inspected information provided by the government *in camera* and determined that the information was not relevant to the case and need not be revealed to the defendants.

Defendants continued to contend before and during trial that the government had not complied with the district court's discovery order. Again during trial the district court inspected materials provided by the government *in camera*; it orally provided some information from those materials to the defendants and then informed them that the materials were not discoverable.

Specifically at issue in the defendants' requests were field notes taken by some of the DEA agents concerning their contacts with Russell.[11] Neither the district court's discovery orders nor

---

[11]    The only notes at issue were those taken by Detective Figueroa, who stated that he made notations of names of people

16

the magistrate's order required disclosure of field notes *per se*. The documents relating to Russell listed in the magistrate's order included "[a]ll memoranda, recordings, letters, receipts, vouchers, transcripts, reports of investigation, statements, or any other documents."

To fall within the scope of the magistrate's order, the notes must be able to be categorized as "statements," as they do not fall within any other described document. The Jencks Act defines "statement" to mean "a written statement made by [a government witness] and *signed or otherwise adopted or approved* by him;" or a recording or transcription of an oral statement or grand jury testimony. 18 U.S.C. § 3500(e) (emphasis added). The district court agreed with the government that the notes did not constitute a statement. This determination is subject to reversal only if clearly erroneous. *United States v. Roemer*, 703 F.2d 805, 807 (5th Cir.), *cert. denied*, 104 S.Ct. 341 (1983).

Figueroa's notes consist of names of persons provided by Russell; they are scattered jottings, not a formal memorandum or report. Figueroa did not sign them, and nowhere is there any indication that he has adopted them as a statement. We hold that these notes were not discoverable statements within the coverage of the Jencks Act. *See United States v. Ramirez*, 954 F.2d 1035, 1038 (5th Cir.), *cert. denied*, 112 S.Ct. 3010 (1992); *Roemer*, 703 F.2d at 806-807.

Although the notes are not subject to disclosure under the

---

given him by Russell. Marquez testified at trial that he did not take notes of his conversations with Russell.

17

Jencks Act, fundamentals of due process require the government to produce them if the evidence they contain is exculpatory or would be of value in impeaching government witnesses. *Giglio v. United States*, 92 S.Ct. 763 (1972); *Brady v. Maryland*, 83 S.Ct. 1194 (1963). Uncertain whether the notes were exculpatory or of impeachment value, the government properly submitted them to the district court for *in camera* inspection. *Pennsylvania v. Ritchie*, 107 S.Ct. 989, 1002-03 (1987).

The district court examined the documents *in camera* and concluded that nothing was discoverable. We have reviewed the materials and determine that this decision was not clearly erroneous.[12] In addition, the defendants were able to recall Figueroa to question him regarding some of the apparent discrepancies between his earlier testimony and the information provided by the district court from the materials it had reviewed *in camera*. No reversible error has been demonstrated in this connection.

IV. Production of Confidential Informant

Mora and Medina claim that the government's failure to produce Russell at trial deprived them of their confrontation and due process rights. When the presence of a confidential informant is

---

[12] The materials submitted by the government to the district court, sealed in the record for review on appeal, consist primarily of notebooks used by Detective Figueroa to record information in the form of the names, addresses, and other pertinent statistics of persons subject to investigation. Most of the information concerns separate investigations and has no bearing on the instant case. The information which is relevant to this case is in the form of notes of the events of March 5, 1992, which are consistent with Figueroa's testimony.

required at trial, the government must make a reasonable effort to produce him. *Fitzpatrick v. Procunier*, 750 F.2d 473, 476 (5th Cir. 1985).

Although Mora suggests that the government was responsible for Russell's disappearance, there is no evidence of this in the record nor any indication that the government impeded attempts to locate Russell. Figueroa testified that he looked for Russell at Russell's home and place of business; there was no indication at either place of Russell's whereabouts. Russell's former roommate and lover did not know where he had gone. The district court subpoenaed Russell, at the request of Medina, but even this measure failed to secure his presence at trial.

This confidential informant was not unknown to the defendants. Indeed, Russell's relationship with Medina predated the DEA investigation. Medina may have known more about Russell than the government did; Medina's testimony at trial revealed that he had Russell's home phone number, mobile number, and pager number. In addition, defendants knew where Russell lived and were able to locate his roommate to testify at trial on their behalf.

The government's attempts to find Russell at his house and place of business were reasonable.

V. Cross-Examination of Agent Geller

Mora and Medina contend that the district court abused its discretion in not allowing them to cross-examine Geller on issues concerning the enhanced penalty provisions, in an attempt to attack Geller's credibility on the amount of marihuana to be delivered. The district court retains a "wide latitude" to impose reasonable

19

restrictions on cross-examination within the context of the confrontation clause. *Delaware v. Van Arsdall*, 106 S.Ct. 1431, 1435 (1986). In light of the fact that the amount of marihuana involved is not an element of the offense, but only an issue relevant to sentencing, there was no abuse of discretion.

VI. Sufficiency of the Evidence

Upon a claim of insufficient evidence to support a conviction, this Court reviews the evidence, whether direct or circumstantial, and all the inferences reasonably drawn from it, in the light most favorable to the verdict. *United States v. Salazar*, 958 F.2d 1285, 1290-1291 (5th Cir.), *cert. filed*, 113 S.Ct. 185 (1992).

A. *Marihuana charges*

Sosa and Lira argue that there was insufficient evidence to convict them of the conspiracy and possession charges. They insist that they were merely in the wrong place at the wrong time. Medina testified that he met Sosa and Lira in connection with some plumbing work that Sosa wanted Mora, Medina's roommate, to do for him and that this was the reason the two men had come to his house on March 5, 1992.

Sosa's and Lira's argument ignores the testimony of Special Agent Ayers, who observed two men from a pickup truck meet with the driver of the Ryder van, load a box into the van, and then drive to the Stadium Bar. By maintaining a constant surveillance of the two vehicles, the DEA agents were able to identify Mora, Sosa, and Lira as the three men who had met to load the marihuana. Once Sosa and Lira reached the parking lot of the Stadium Bar, they moved their pickup truck into a position where they had a good view of the van.

20

A reasonable jury could infer that Sosa and Lira knew the contents of the box they loaded into the van, based upon the testimony of Special Agent Geller who stated that the marihuana was unsealed and that he could smell the marihuana in the van.

Based upon this evidence, a reasonable jury could find that Sosa and Lira were part of the conspiracy to sell marihuana to Geller and that they possessed marihuana with the intent to deliver it.

B. *Gun count*

Sosa's conviction of use of a firearm during and in relation to a drug trafficking offense, a violation of 18 U.S.C. section 924(c)(1), stems from Detective Figueroa's discovery of the 22-caliber semi-automatic hand gun beneath Sosa's seat in the pickup. The gun was loaded and functioning. Sosa contends that there is no evidence that he had actual or constructive possession of the gun; no fingerprints were discerned on the gun, and its ownership could not be traced.

There was other evidence, however, which could link the gun to Sosa. The gun was under his seat in the pickup truck, and it had shifted in such a way as to be visible under the edge of the seat. The jury could infer from the fact that the gun was sticking out from under the seat that Sosa knew of its presence. The pickup truck was registered in his wife's name, but she could not drive it because it was a standard shift. When his wife had looked in the truck a week before the arrests on March 5, she had not seen a gun in it.

The government asserts that the evidence supports the jury's

finding that Sosa "used" the gun in relation to the delivery of marihuana under the broad interpretation given U.S.C. section 924(c)(1). Conviction under this section "'does not depend on proof that the defendant had actual possession of the weapon or used it in any affirmative manner [but only that] the firearm was available to provide protection to the defendant in connection with his engagement in drug trafficking.'" *United States v. Ivy*, 973 F.2d 1184, 1189 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 1826 (1993) (quoting *United States v. Raborn*, 872 F.2d 589, 595 (5th Cir. 1989)). *See also United States v. Caldwell*, 985 F.2d 763, 765 (5th Cir. 1993) ("a defendant can violate § 924 where the weapon *could have been used* to protect, facilitate, or have the potential to facilitate drug trafficking") (emphasis added).

It is clear that the law in this Circuit does not require that the firearm be actually brandished or fired or even visibly present in order for the evidence to sustain a section 924(c) conviction. *See, e.g*, *United States v. Beverly*, 921 F.2d 559, 562-563 (5th Cir.), *cert. denied*, 111 S.Ct. 2869 (1991) (revolvers found under mattress in room containing cocaine sufficient); *United States v. Molinar-Apodaca*, 889 F.2d 1417, 1424 (5th Cir. 1989); *United States v. Coburn*, 876 F.2d 372, 375 (5th Cir. 1989).

A jury could infer from the presence of the gun, loaded, at the edge of the driver's seat, and from the position of the pickup truck in a place to monitor the activity around the Ryder van containing the marihuana, that Sosa knew of the presence of the gun and that he was present at the site of the delivery to provide backup for Medina and Mora, an activity enhanced by the gun's

22

presence.

VII. Amount of Marihuana for Sentencing Purposes

We will uphold a sentence imposed under the Sentencing Guidelines so long as it is the result of a correct application of the Guidelines to factual findings which are not clearly erroneous. *United States v. Alfaro*, 919 F.2d 962, 964 (5th Cir. 1990).

Medina and Mora challenge the district court's determination that their offenses involved five hundred pounds of marihuana rather than only the fifty pounds which were actually delivered to Agent Geller. Medina testified that his source for the marihuana was someone he met in a bar, and that it was only fifty pounds. He denied ever claiming to have seen three thousand pounds in a warehouse or ever telling Russell he would get five hundred pounds for him. Mora stated that Medina's discussions with Geller were only for fifty pounds, not five hundred.[13] In contrast, Geller testified that the negotiations were for five hundred pounds and that a transaction involving only fifty pounds would not be enough to justify the time and manpower required for such a sting operation.

Mora and Medina contend that the district court did not make findings of facts, as required by FED. R. CRIM. P. 32(c)(3)(D) and U.S.S.G. section 6A1.3, to explain its resolution of disputed facts regarding the amount of marihuana involved in the offense.

The district court may accept the facts set forth in the PSR

---

[13] Mora's testimony contradicts that of Medina, who claimed that he never discussed anything concerning the delivery of marihuana with Geller but only with Russell.

23

even when these facts are disputed.  *United States v. Rodriguez*, 897 F.2d 1324, 1327-1328 (5th Cir.), *cert. denied*, 111 S.Ct. 158 (1990).  This Court has held that a defendant is generally provided adequate notice of the district court's resolution of disputed facts when the court merely adopts the findings of the PSR.  *United States v. Mueller*, 902 F.2d 336, 347 (5th Cir. 1990).

The district court considered and expressly denied defendants' objections to the PSR, including their argument that the offense involved only fifty-two pounds of marihuana.  In denying the objections, the court implicitly relied upon the recommendation of the PSR.  In addition, in its judgment, the court made clear that it adopted the findings of the PSR.  This was a sufficient determination that the object of the conspiracy was the delivery of five hundred pounds of marihuana.

Defendants urge that we also consider the district court's alleged failure to determine not only the amount of marihuana which was the subject of the negotiations, but also whether the defendants intended to deliver, and were capable of delivering, that amount of marihuana.  U.S.S.G. section 2D1.4 (1991) provides that if a defendant is convicted of a conspiracy involving a controlled substance, the offense level shall be the same as if the object of the conspiracy had been completed.[14]  The commentary qualifies this language, however, by providing that

---

[14]    The 1992 amendments to the Guidelines place the substance of 2D1.4 and its commentary in Application Note 12 to section 2D1.1. Although no substantive change occurred with this amendment, we apply the prior version of the Guidelines which was in effect both when the defendants committed the offense and when they were sentenced.

24

"where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing." Application Note 1, U.S.S.G. § 2D1.4 (1991).

Neither Mora nor Medina raised this issue before the district court. In their objections to the PSR, both written and at the sentencing hearing, their focus is entirely on the amount of marihuana which was the subject of the negotiations; they do not contend that they never intended to deliver the negotiated amount nor that they were unable to do so.

Because the defendants have failed to raise this objection below, any failure of the district court to make explicit findings on this issue must be reviewed for plain error. Plain error is "'error so obvious that [this Court's] failure to notice it would seriously affect the fairness, integrity, or public reputation of [the] judicial proceedings and result in a miscarriage of justice.'" *United States v. Surasky*, 974 F.2d 19, 21 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 1948 (1993) (quoting *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir.), *cert. denied*, 111 S.Ct. 2032 (1991)).

Where a defendant has disputed his intent or capability to deliver the amount of a controlled substance under negotiation, the sentencing court should make a finding on that issue. *United States v. Stevens*, 985 F.2d 1175, 1183 (2d Cir. 1993). In the absence of some objection by the defendant, either oral or written, however, the district court is not required to anticipate a dispute

25

over intent or ability.[15]  Moreover, there was sufficient evidence at trial, primarily in the form of Agent Geller's testimony, to support findings on amount, intent, and ability.[16]

The district court did not commit plain error by not making a finding on the issues of intent and ability.

## Conclusion

For the reasons stated above, the convictions and sentences of the defendants are

AFFIRMED.

---

[15]   In finding that the district court had no duty to foresee the issues of intent and capability in this case, we place the burden on the defendants to raise these issues below.  This burden is not a burden of proof.  Because we find that the defendants did not adequately meet their burden of raising these issues in a timely manner, we do not reach the question of whether the defense or the government would bear the burden of proving (or disproving) intent and capability, a question which has received disparate treatment among other circuits. *Compare United States v. Barnes*, No. 91-50421, 1993 U.S. App. LEXIS 11153 (9th Cir. May 17, 1993) (defendant bears burden)*; United States v. Candito*, 892 F.2d 182, 186 (2d Cir. 1989) (same, implicit)*; United States v. Christian*, 942 F.2d 363, 368 (6th Cir. 1991), *cert. denied*, 112 S.Ct. 905 (1992) (same)*; with United States v. Bradley*, 917 F.2d 601, 604-605 (1st Cir. 1990) (burden on government)*; United States v. Richardson*, 939 F.2d 135, 142-143 (4th Cir.), *cert. denied*, 112 S.Ct. 599 (1991) (same, implicit)*; United States v. Ruiz*, 932 F.2d 1174, 1183-1184 (7th Cir.), *cert. denied*, 112 S.Ct. 151 (1991) (same).

[16]   Geller testified that the negotiations concerned five hundred pounds of marihuana, that Medina claimed to have access to three thousands pounds of marihuana, and that both Medina and Mora made efforts to keep the transaction alive when he expressed displeasure with delays and proposed changes in the delivery.