**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                 No. 95-5359

CARLOS TREVINO,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Chief District Judge.
(CR-94-78-F)

Argued: February 2, 1996

Decided: July 12, 1996

Before HALL and HAMILTON, Circuit Judges, and PHILLIPS,
Senior Circuit Judge.

_____

Affirmed by published opinion. Judge Hall wrote the majority opin-
ion, in which Judge Hamilton joined. Judge Phillips wrote a concur-
ring and dissenting opinion.

_____

**COUNSEL**

**ARGUED:** George Alan DuBois, Assistant Federal Public Defender,
Raleigh, North Carolina, for Appellant. John Samuel Bowler, Assis-
tant United States Attorney, Raleigh, North Carolina, for Appellee.
**ON BRIEF:** Janice McKenzie Cole, United States Attorney, J. Doug-
las McCullough, Assistant United States Attorney, Raleigh, North
Carolina, for Appellee.

**OPINION**

HALL, Circuit Judge:

A jury found Carlos Trevino guilty of conspiring to traffic in marijuana and of traveling in interstate commerce in aid of racketeering. Trevino appeals the convictions, contending that the district court erred by denying his motion to disclose the Presentence Investigation Reports (PSRs) of conspiracy members who testified against him. Neither Trevino nor his counsel have seen the reports; the district court examined the PSRs in camera prior to announcing its decision. On appeal, we have reviewed the PSRs at issue, and we are satisfied that the district court's ruling was not clearly erroneous; we therefore affirm.

I.

According to the government, Trevino was involved in a marijuana distribution conspiracy headed by Stephen Wilson. Wilson began selling marijuana in 1983 after his farming business became unprofitable; he continued to traffic in large quantities of marijuana until sometime in 1992 or 1993. On December 6, 1994, the grand jury indicted Trevino, charging that he participated in the conspiracy, and that he traveled in interstate commerce with the intent to facilitate an unlawful activity. See 21 U.S.C.A § 846 (West Supp. 1996); 18 U.S.C.A. § 1952 (West Supp. 1996).

The government's case against Trevino consisted of the testimony of twelve witnesses; as many as nine of them were connected with the conspiracy. Prior to trial, Trevino requested that the district court release the presentence reports of seven eventual witnesses who had previously entered into plea agreements with the government. The court, after obtaining the PSRs and examining them in camera, denied Trevino's request.

At trial, Wilson told how he had been introduced to marijuana growers and dealers by a companion he had met in Florida, where he had gone to purchase tomatoes to resell in North Carolina. Wilson took his tomato profits and bought approximately twenty pounds of

2

marijuana from Joe Munyos in southern Texas. Wilson's new business flourished, and he began to hire couriers to transport large quantities of marijuana purchased from Munyos or another supplier, Freddy Gonzales.

Wilson testified that he met Trevino in 1988 when Trevino accompanied Munyos on a trip to North Carolina. Wilson stated that he initially hired Trevino, who speaks Spanish, to help oversee the Mexican migrants who worked on Wilson's farm. According to Wilson, Trevino eventually became his "right-hand man" in the drug business, coordinating the Texas-to-North Carolina runs. Wilson said that he fired Trevino on January 1, 1991, upon learning that Trevino had skimmed $16,000 from a drug payment that he was to deliver to Gonzales. Wilson estimated that, over the entire course of the conspiracy, his operation had sold over fifteen tons of marijuana.

The other testifying co-conspirators detailed their sundry dealings with Trevino. Some admitted having accompanied Trevino on drug-buying trips; others mentioned having delivered drugs to him from time to time.

Customs agent Michael Doherty concluded the government's case. He testified that, during a telephone conversation, Trevino admitted being involved with Wilson in the marijuana business, though simultaneously insisting that Wilson was the mastermind.

Trevino took the stand and denied any wrongdoing. The jury, however, decided otherwise; it found Trevino guilty of both charges, and he was subsequently sentenced by the district court to 151 months' imprisonment. Trevino appeals, maintaining that the court's denial of his request for the PSRs warrants a new trial.

II.

A.

Due process requires that the government disclose to the accused any favorable evidence in its possession that is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963).[1] "Favorable"

_____

[1] Ordinarily, the accused must ask the government to produce Brady materials; however, "there are situations in which evidence is obviously

3

evidence includes not only that evidence tending to exculpate the accused, but also any evidence adversely affecting the credibility of the government's witnesses. United States v. Bagley, 473 U.S. 667, 676 (1985); Giglio v. United States, 405 U.S. 150, 154-55 (1972), citing Napue v. Illinois, 360 U.S. 264 (1959). **2** Evidence is "material" if there is a reasonable probability that it will affect the result of the proceeding. See Bagley at 682 (opinion of Blackmun, J.).

On occasion, the government may possess potential Brady material that it deems privileged or that is otherwise confidential. If the accused does not specifically request that it be produced, this material is treated much like everything else in the government's file, i.e., "the prosecutor's decision on disclosure is final." Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987). If, however, the accused is able to identify the requested confidential material with some degree of specificity, he may then attempt to convince the district court that it is subject to disclosure. See id. at 58 n.15 (requiring the accused to "at least make some plausible showing" of how the evidence would be "both material and favorable to his defense"), quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982); see also Love v. Johnson, 57 F.3d 1305, 1313 (4th Cir. 1995) (district court's judgment dismissing habeas petition vacated where state court declined to undertake an in camera examination of subpoenaed materials, even though the petitioner's showing "far exceeded that held sufficient by the Ritchie Court.").

_____

of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." United States v. Agurs, 427 U.S. 97, 110 (1976).

**2** Where the source of the potential impeachment material is the witness's own prior statement, the government is not required to disclose the statement to the accused until concluding its direct examination of the witness. 18 U.S.C.A. § 3500 (West 1985), codifying Jencks v. United States, 353 U.S. 657 (1957); United States v. Lewis, 35 F.3d 148, 151 (4th Cir. 1994).

4

Once the accused has made a plausible showing that the evidence would be both material and favorable, the trial court must review the information in camera to ascertain its true nature and determine whether it must be disclosed. Ritchie at 58-60; Love at 1313.**3** The court conducts its examination in private because the Constitution does not accord an accused the right of unrestricted access to the government's files. Ritchie at 59-60; Love at 1313; see also United States v. Leung, 40 F.3d 577, 583 (2d Cir. 1994) ("In the rare circumstances where [an in camera] inspection is required, its purpose is not to provide a general discovery device for the defense[.]"). The trial court's ultimate conclusion as to whether the information is subject to disclosure -- whether the evidence is both material and favorable -- may be disturbed on appeal only if it is clearly erroneous. United States v. Mora, 994 F.2d 1129, 1139 (5th Cir.), cert. denied, 114 S. Ct. 417 (1993).

B.

Presentence reports represent a special subcategory of potentially discoverable confidential information, and rules governing their disclosure have evolved apart from the relatively recent Ritchie decision and the line of lower court cases that have followed. In United States v. Figurski, 545 F.2d 389 (4th Cir. 1975), we held that presentence reports prepared on behalf of government witnesses must be examined by the district court in camera before any of the information contained therein is disclosed to the accused. Id. at 392. We did not, however, establish any guidelines to assist the courts in making the necessary threshold determination, i.e., whether an accused has sufficiently justified the court's involvement in the discovery process. In view of the potential effect of Ritchie on the distinct body of law pertaining to the disclosure of presentence reports, and in view of the issue on appeal, the time is ripe to speak on the subject.

_____

**3** An in camera review is also warranted where the government, pursuant to its duty under Agurs, see note 1, supra, submits confidential material to the court on its own initiative. See Mora, infra, at 1139 (agent's field notes, not subject to disclosure under the Jencks Act, were produced by the government and determined by the district court, following an in camera review, to be not otherwise discoverable).

1.

The PSR may serve several purposes, but its principal function is to assist the district court in imposing an appropriate sentence on the criminal defendant who is the subject of the report. United States v. Charmer Industries, Inc., 711 F.2d 1164, 1170 (2d Cir. 1983). Obviously, a PSR that is as accurate and complete as possible helps to ensure a just sentence. PSRs must include, inter alia, pertinent information about the defendant's life history and personal characteristics (including any prior criminal record), the defendant's financial condition, a victim impact assessment, the probation officer's proposed classification of the offense and the defendant's criminal history under the Sentencing Guidelines, and "any other information required by the court." Fed. R. Crim. P. 32(b)(4).

Indeed, concern over the accuracy of PSRs has resulted in several amendments to Rule 32 over the past thirty years, most recently in 1994. Before 1975, most federal courts did not permit the defendant to see his own PSR, much less comment on it. Fed. R. Crim. P. 32 advisory committee note (1974); see also Charmer at 1172. Rule 32(b) now provides that, except for the probation officer's final recommendation on the sentence (which the district court may direct be excluded), the entire report must be provided to the defendant and his counsel not less than 35 days prior to the sentencing hearing. Upon receiving his PSR, the defendant is entitled to contest any material information contained in or omitted from the report. Rule 32(b)(6)(B).

With the advent of the amendments requiring full disclosure to the defendant, certain materials once commonly included in PSRs have now been excluded. Rule 32(b)(5) requires the exclusion of "any diagnostic opinions that, if disclosed, might seriously disrupt a program of rehabilitation[,] . . . sources of information obtained upon a promise of confidentiality[,] or . . . any other information that, if disclosed, might result in harm, physical or otherwise, to the defendant or other persons." The district court may still receive and rely on such material in determining sentence, but, if it does, the court must summarize the information for the defendant and give him a reasonable opportunity to comment. Fed. R. Crim. P. 32(c)(3)(A).

Notwithstanding that PSRs prepared in accordance with the 1994 amendments are somewhat watered-down versions of their earlier

6

incarnations, there are still valid reasons to prohibit the routine disclosure of their contents to defendants in subsequent proceedings against whom the subject of the report will testify. See U.S. Dep't of Justice v. Julian, 486 U.S. 1 (1988):

> [I]n both civil and criminal cases the courts have been very reluctant to give third parties access to the presentence investigation report prepared for some other individual or individuals. . . . [O]ne reason for this is the fear that disclosure of the reports will have a chilling effect on the willingness of various individuals to contribute information that will be incorporated into the report. A second reason is the need to protect the confidentiality of the information contained in the report. Accordingly, the courts have typically required some showing of special need before they will allow a third party to obtain a copy of a presentence report.

Id. at 12 (emphasis deleted) (citations omitted). Granted, the "chilling effect" on contributors should be ameliorated somewhat now that sources of confidential information can no longer be named in the PSR. Nevertheless, we must point out that the rule only specifically excludes mention of the source of the information; it does not necessarily exclude the information itself.[4]  As the PSR is exposed to pair upon pair of prying eyes, it becomes more likely that someone -- particularly a criminal confederate -- will be able to identify the source of sensitive information contained in the report. [5]

_____

[4] The rule does prohibit inclusion of any information that "might" result in harm to anyone, but, unless all information is excluded, there are no assurances that the desired effect will be achieved. We would indeed be hesitant to embrace an approach that, through an overabundance of caution, is capable of producing only a plain vanilla PSR. Such a document would be of little use to the district court, which would be constrained to consult outside sources to obtain the needed information. The defendant awaiting sentencing would be disserved as a result, because he would only be permitted to view the court's written summary of the information. We would then have come full circle to the pre-1975 days, when the defendant was sentenced on the basis of information that he could not effectively question.

[5] Moreover, we would not overlook the common-sense observation that perception often dictates reality. Even if the utmost care is taken to

7

In addition to the chilling effect on potential contributors, the Julian Court noted the prevailing view that routine disclosure of confidential PSR information may compromise the defendant's privacy interest in that material. As we have already noted, the defendant's criminal history and current financial condition are always contained within the PSR. The reports also frequently detail the subject's childhood and family history, education and work resume, mental and physical condition, and history of substance abuse. Needless to say, these are all factors that the district court will often consider in fixing a just sentence, and on which the Bureau of Prisons may properly rely in classifying the defendant for incarceration. However, they are also intensely personal matters.

Of course, the documents at issue in Ritchie-- state agency records compiled on a juvenile rape victim -- no doubt also contained highly sensitive and personal information. The difference between those records and the PSRs under consideration here is that, in the case of the former, the applicable state statute specifically authorized unconditional disclosure to third parties by court order. Ritchie at 57-58. The Supreme Court thus reasoned that, inasmuch as the state legislature contemplated the use of the records in judicial proceedings, there was no apparent state policy against disclosing them in criminal prosecutions. Id. at 58.

There is simply no parallel provision of federal law that permits such facile disclosure of presentence reports. To the contrary, the confidentiality of PSRs has always been jealously guarded by the drafters of the federal rules, and by the federal courts. See Julian at 12 (collecting cases). Moreover, there is no indication in Ritchie that the state agency's records, unlike PSRs, tended to contain material that, if disclosed, could result in harm to the source. Consequently, we are of the opinion that PSRs are entitled to a greater degree of protection from examination and disclosure than the records before the Supreme Court in Ritchie.

_____

ensure their anonymity, contributors who are aware that what they say may be subject to wide dissemination will naturally be reluctant to come forward, and no amount of soothing assurances from the government are likely to overcome their reticence.

2.

We also note that PSRs, by their very nature, do not fit particularly well within the Brady/Giglio framework. The initiating procedure is not unusual; if a report's submission to the district court is not compelled by Agurs, see notes 1 and 3, supra, then the accused must, as with any other potential Brady material, request that it be produced. However, unlike most potential Brady material, the existence of a PSR is a foregone conclusion, and its general contents are predictable.

The result is that, although our adversary system of justice rightly requires defense counsel to uncover potentially favorable evidence, an experienced advocate may avail himself of a "free shot" by couching what is actually a general request for a witness's PSR in seemingly specific terms that might suffice as "some plausible showing" of materiality and favorability under Ritchie. For instance, in the Eastern District of North Carolina, every PSR contains a section entitled "Impact of the Plea Agreement," which, in Trevino's words, "states in concrete terms how a witness's guideline range was affected by the plea agreement between the parties." Brief of Appellant at 19.

An accused armed with that knowledge would almost certainly be able to satisfy Ritchie's threshold requirement with regard to any cooperating witness by merely asserting that the witness's PSR contains evidence of his or her potential bias in favor of the government. If Ritchie controlled, such an assertion would trigger the district court's duty to examine the entire PSR in camera , regardless of whether the plea agreement (1) actually had an effect on the witness's Guideline range that is (2) substantial enough to give rise to a fair inference of bias.

This simply will not do. The adversary system does not permit either party to "engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents." United States v. Zolin, 491 U.S. 554, 571 (1989) (holding that party asserting crime-fraud exception to attorney-client privilege must make threshold showing to trigger in camera review).

C.

We conclude that a district court is under no duty to conduct an in camera examination of a requested PSR unless the accused has first

9

clearly specified the information contained in the report that he expects will reveal exculpatory or impeachment evidence. Though the imposition of such a requirement will not eliminate"fishing expeditions" altogether, it may serve to curtail them.

Further, in light of the important policy concerns attendant to the preparation and use of PSRs, we are not confident that the Ritchie threshold standard of evaluating the accused's proffer of materiality and favorability adequately protects the compelling public and private interests in keeping confidential the data assembled therein; more than "some plausible showing" is needed. We therefore hold that, as a prerequisite to an in camera review, an accused must plainly articulate how the information contained in the PSR will be both material and favorable to his defense.**6**

We recognize that an economy of words seldom conveys a depth of meaning, and, thus, terms like "clearly specify" and "plainly articulate," in and of themselves, offer little guidance to a district court trying to decide whether to grant an accused's request for in camera review of a government witness's PSR. It is enough, however, if we have adequately conveyed our wish that the court pause before granting the request. The decision to grant or deny review will necessarily lie within the district court's sound discretion, and that is as it should be.

III.

In the case at bar, the district court exercised its discretion in favor of granting Trevino's request, and it decided to examine the PSRs of the government's witnesses in camera. Upon evaluating the reports in accordance with the standards set forth in Figurski, the court concluded that it need not disclose any of the information contained therein.

_____

**6** In evaluating the probable materiality and favorability of the requested information, the district court may consider, among other things, whether the material may be available from other sources and, if impeachment material, whether the witness will effectively be impeached otherwise.

10

We review only to see whether the district court's decision was clearly erroneous.[7] <u>United States v. Strifler</u>, 851 F.2d 1197, 1202 (9th Cir. 1988), <u>cert. denied</u>, 489 U.S. 1032 (1989). Our independent examination of the PSRs has revealed no clear error. Trevino's convictions are, therefore, affirmed.

AFFIRMED

PHILLIPS, Senior Circuit Judge, concurring and dissenting:

I concur in the judgment and in all of the majority opinion except Part II which, with all respect, I think is both unnecessary to our decision, and substantively wrong.

Appellant sought in the district court an <u>in camera</u> review, pursuant to <u>United States v. Figurski</u>, 545 F.2d 389 (4th Cir. 1976), of the Presentence Reports (PSR's) of several previously convicted potential government witnesses against him. The district court faithfully conducted the review, found no material warranting disclosure under applicable law, and so refused any disclosure of PSR contents to appellant. Appellant's appeal properly sought review of that decision. We have conducted that review of the properly sealed PSR's and found no error. That is sufficient to decide the appeal, so I concur in the court's judgment affirming the district court's ruling.

The majority goes beyond that, however and in Part II of its opinion lays down a new rule (for prospective application only?) concerning the showing that defendants must make in the district courts to obtain <u>in camera</u> review of government-witness PSR's. That obviously is not necessary to our decision here where the district court conducted <u>in camera</u> review on the showing made in conformity with the procedure provided in <u>Figurski</u>.

More critically, the new rule is at odds with <u>Figurski's</u> in a way that, if followed, effectively and improperly overrules that circuit pre-

_____

[7] In Trevino's case, we directed the district court to certify the PSRs as supplements to the record on appeal. The better procedure would have been for the court, upon concluding its <u>in camera</u> review, to immediately seal the reports and designate them for inclusion in the record.

11

cedent in a critical respect. The majority assumes power to do this on the basis (1) that Figurski left open the exact showing required, and (2) (somewhat inconsistently) that, in any event, intervening Supreme Court authority, Pennsylvania v. Ritchie, 480 U.S. 39 (1987), has suggested that the majority's newly-adopted rule is the proper constitutionally-based one for triggering in camera review of the materials here at issue, and (3) that policy concerns support the new rule. I respectfully disagree with each of these.

Figurski does not leave open the showing required. It simply requires very little: no more than a request based upon an assertion that there are PSR's in existence with respect to particular government witnesses. But it states the requirement fully and clearly: "[W]hen requested to exhibit [a PSR], the district court should examine it in camera and disclose only those portions, if less than all, which [are exculpatory or, if only impeaching, reveal a reasonable likelihood of affecting the trier of the fact]." Figurski, 545 F.2d at 291-92.

Nor does Ritchie open the door for a re-examination of Figurski's rule. Ritchie dealt only with the showing required to trigger in camera review of a very specific and highly sensitive type of material-- government agency records concerning the alleged victim of sexual abuse crimes. It did not purport to lay down a generally applicable constitutional rule respecting all types of defense materials subject to in camera review for possible disclosure. There are obvious reasons for requiring a more stringent showing in that context than in this. Furthermore, it is questionable whether Ritchie's requirement is, as a practical matter, any more stringent than is Figurski's. See Ritchie, 480 U.S. at 44, 58 n.15. Ritchie cannot be read as implicitly overruling our Figurski precedent--certainly not by a panel of this court.

Finally, the policy concern drawn on by the majority simply does not fit. The concern expressed is the protection of confidentiality of PSR's with emphasis on the undoubtedly good reasons why they must be protected from routine disclosure. But their confidentiality is already fully protected in the only needed and relevant way--from disclosure of their contents to the defendant or the general public-- precisely by Figurski's procedure for in camera review. The majority's new rule would only extend that already adequate protection to

12

an uncertain amount of PSR material that would not even be disclosed to judicial eyes. That has never been, so far as I know, a proper concern in judicial or legislative protections of confidentiality. Except where confidentiality is absolute (if there be such) someone after all has to have access to determine its limits. Confidentiality therefore is not itself a justification for imposing the new rule.

Quite another policy concern than the expressed one of confidentiality may be implicit in the majority's position. There are intimations of concern with the undue burden imposed on the courts--particularly the district courts--by Figurski's modest requirement for triggering in camera review. That may be a legitimate concern--the district court was at pains to disavow any precedential effect for its decision to review in camera here--but Figurski has been on the books and apparently in unquestioned operation now for twenty years. If its procedure--grounded in constitutional concerns--is nevertheless on balance too light on defendants and too heavy on the courts, the answer for us can only properly lie in an en banc reexamination of its rule, not by way of panel dictum in a case where its rule was applied without objection.

13