PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

             *Plaintiff-Appellee,*

v.

LAMONT CLINTON KING,

             *Defendant-Appellant.*

No. 07-4885

UNITED STATES OF AMERICA,

             *Plaintiff-Appellee,*

v.

LAMONT CLINTON KING,

             *Defendant-Appellant.*

No. 08-4405

Appeals from the United States District Court
for the Eastern District of North Carolina, at New Bern.
David A. Faber, Senior District Judge.
(4:05-cr-00109-FA-1; 4:06-cr-00032-FA-1;
5:07-cr-00009-FA-1)

Argued: October 28, 2010

Decided: January 10, 2011

Before MOTZ, AGEE, and WYNN, Circuit Judges.

Affirmed in part and vacated and remanded in part by published opinion. Judge Motz wrote the opinion, in which Judge Agee and Judge Wynn joined.

---

**COUNSEL**

**ARGUED**: Jorgelina E. Araneda, ARANEDA LAW FIRM, Raleigh, North Carolina, for Appellant. Jennifer P. May-Parker, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** George E. B. Holding, United States Attorney, Anne M. Hayes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

A jury convicted Lamont Clinton King of possession with intent to distribute controlled substances, possession of a firearm in furtherance of a drug trafficking crime, and two counts of being a felon in possession of a firearm. On appeal, King challenges his convictions on several grounds. We vacate one of his convictions and the accompanying sentence for being a felon in possession and remand for further proceedings consistent with this opinion. We affirm in all other respects.

I.

King's convictions stem from two separate incidents, one occurring in Greenville, North Carolina and the other in Wilmington, North Carolina. We set forth the facts of each incident and then describe the pretrial and trial proceedings that followed.

A.

1.

On March 19, 2004, Greenville police officers received information that two African-American men planned to use a gray Ford Explorer to transport a large amount of heroin from the local bus station. The officers initiated surveillance of the station and observed two African-American men drive away from the station in a gray Ford Explorer. The police followed the Explorer to a nearby strip mall, at which the men left the car and entered a laundromat. Shortly thereafter, the men returned with King and, after King placed a green gym bag in the Explorer, the three men drove away together. When the officers stopped and searched the Explorer, they found the green gym bag, which contained 100 dosage units of heroin packaged in ink-stamped wax paper. The police arrested King and the other men.

Two detectives then returned to the laundromat from which King had emerged and spoke with Nina Woods. After learning that Woods shared an apartment with King, the detectives obtained her consent to search that apartment. Within its sole bedroom, they found approximately 426 plastic bags of cocaine and seven dosage units of heroin packaged in the same ink-stamped wax paper as the heroin found in the green gym bag that King had placed in the Explorer. They also found cutting agent, one gram of marijuana packaged in a plastic bag, and a firearm. In the bedroom closet, they found two coffee grinders (which drug traffickers often use to mix drugs and cutting agents), two boxes of bullets, and two more firearms.

The police subsequently interviewed King, and he admitted ownership of the cocaine, heroin, coffee grinders, cutting agent, and firearms. King was charged with various violations of state law, and after agreeing to cooperate with the police, King secured his release on bail.

## 2.

Nine months later, on December 8, 2004, Shatiek Bilal reported to Wilmington police officers that King had kidnapped and assaulted him. Bilal also told the officers that King rented an apartment at which Bilal was living and that King kept drugs and guns at the apartment and in a separate storage unit. Based on Bilal's information, the officers obtained a search warrant to the apartment, in which both King and Bilal lived, and to the storage unit, to which only King had access.

After watching the apartment for approximately four hours, the police saw King enter the apartment with a woman at about 3:30 a.m. on December 9. The officers then executed the search warrant. In a bedroom, in which King was lying near the bed, they found a box containing 5.2 grams of crack cocaine packed in green dime bags, 1.3 grams of heroin, and 14 bags of marijuana. Nearby they found digital scales, a heat sealer, and a handgun. In the same room they also found King's identification card and state registration card bearing the apartment's address. In another bedroom, containing Bilal's personal effects, the officers found one green dime bag of marijuana and a larger clear plastic bag containing similar green bags. The officers found no contraband in the storage unit.

When the officers interviewed King, he told the police that he knew nothing about the kidnapping or beating of Bilal, and he denied responsibility for the contraband in the apartment. Nevertheless, King was charged with Bilal's kidnapping and assault, along with drug trafficking and firearm possession in violation of state law. Neither federal nor state authorities charged Bilal with any crime arising from evidence found in the search.

## B.

A year later, all state charges against King were dismissed when a federal grand jury returned an indictment charging

him with six federal crimes. The first three pertain to the Greenville incident: (1) possession with intent to distribute cocaine, heroin, and marijuana in violation of 21 U.S.C. § 841(a)(1) (Count One); (2) possession of three firearms after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) (Count Two); and (3) using, carrying, and possessing a firearm, during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Three). The remaining three counts allege crimes assertedly committed in Wilmington: (1) possession of crack cocaine, heroin, and marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count Four); (2) possession of a firearm after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) (Count Five); and (3) using, carrying, and possessing a firearm, during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Six). The Government did not bring any federal charges against King for his alleged assault and kidnapping of Bilal.

From the outset of the Wilmington proceedings, King moved to compel disclosure of all information regarding Bilal and his cooperation with the police. The district court found King's first pre-trial motion for this evidence moot "because the Government already has been engaging in virtual open file document discovery."

Months later, after this Court consolidated the various charges pending against King and assigned the cases to another district judge, King renewed his motion to compel disclosure of all documents regarding Bilal, including Bilal's grand jury testimony.[1] King also maintained that the Government had suppressed exculpatory information regarding Bilal's post-indictment trafficking charges and alleged perjury in New York.

---

[1]Twenty months elapsed after King's indictment prior to trial because King escaped from custody once and changed counsel three times.

With respect to the latter information, the Government acknowledged that Bilal had told a New York prosecutor something to the effect of "I don't want to go to North Carolina. I wasn't involved in anything down there." The Government lawyer contended, however, that she had kept King's prior defense counsel informed of Bilal's activities in New York.

As for Bilal's grand jury testimony, the prosecutor admitted that the Government possessed, but had refused to produce, that testimony. The prosecutor maintained that the grand jury testimony contained no exculpatory information. The district court suggested that the Government "might want to" disclose Bilal's grand jury testimony "out of an abundance of precaution," but declined to order such disclosure because it "[didn't] know what's in the testimony regarding Mr. Bilal and we have to rely on the government's good faith in these situations." At no point did the court examine the grand jury transcript or rule on the materiality of the information contained in it.

## C.

At trial, the police officers testified to the evidence recovered in the Greenville and Wilmington searches, as outlined above. King testified in his own defense.

With respect to the Greenville offenses, King admitted that he owned the cocaine and heroin, that he had cut and packaged the cocaine for distribution the night before its seizure, and that, although he knew he was a convicted felon, he owned two of the three firearms.[2] But King denied any link between the firearms and drug distribution, claiming that he had acquired the guns for protection after he had been burglarized.

---

[2]Although King told police when he was arrested that he owned all three firearms, he testified at trial that he only owned two of them but "took responsibility for" the third.

As to the Wilmington charges, King denied responsibility for the drugs and firearms found in the apartment he shared with Bilal; he claimed that Bilal owned all of the contraband. King testified that although he paid rent on the apartment in which the police found him, only Bilal lived there permanently. King further maintained that, on the night in question, he entered the apartment only to "have relations" with his female companion. Although Bilal had testified before the grand jury, he did not testify at trial.

The jury convicted King of all three Greenville crimes (Counts One, Two, and Three) and one of the Wilmington crimes (Count Five). The district court granted the Government's motion to dismiss Counts Four and Six on which the jury could not reach agreement. At sentencing, the court applied an eight-level enhancement based on King's alleged kidnapping of Bilal and then imposed an aggregate sentence of 408 months of imprisonment.

On appeal, King challenges two of his convictions growing out of the Greenville search and the sole conviction arising from the Wilmington search.

## II.

With respect to the Greenville offenses, King contends that the charges as to Counts One and Three were duplicitous and that Count Three did not charge him with a crime. He also maintains that the convictions on both counts rested on insufficient evidence. All of these arguments lack merit.

## A.

At the outset, we note that King has waived his duplicity challenges because he failed to raise them prior to trial. *See* Fed. R. Crim. P. 12(b)(3)(B) (requiring defendants to bring a "motion alleging a defect in the indictment" before trial); *United States v. Price*, 763 F.2d 640, 643 (4th Cir. 1985)

(finding duplicity challenge waived when brought after trial). Only upon a showing of "good cause" can a defendant avoid waiving a forfeited duplicity claim. Fed. R. Crim. P. 12(e). King has not even attempted to make such a showing here.

We must also reject King's contention that Count Three failed to charge a violation of § 924(c). Because this argument attacks the sufficiency of the indictment, and not merely its alleged duplicity, King's failure to raise this argument before trial does not waive it. *See* Fed. R. Crim. P. 12(b)(3)(B). But this failure restricts our review to plain error. *See United States v. Cotton*, 535 U.S. 625, 631 (2002). To demonstrate plain error, a defendant must demonstrate: (1) error; (2) that is plain; and (3) that affects his substantial rights. *See United States v. Olano*, 507 U.S. 725, 732 (1993). We will then exercise our discretion to reverse only if "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation omitted). Moreover, we will construe the indictment "liberally" and indulge "every intendment . . . in support of [its] sufficiency." *United States v. Sutton*, 961 F.2d 476, 479 (4th Cir. 1992) (internal quotation omitted).

Section 924(c) mandates that a court increase by five years the sentence of a drug offender "who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A). The statute thus penalizes two separate types of conduct: (1) the use or carrying of a firearm during and in relation to the commission of a drug trafficking crime; or (2) the possession of a firearm in furtherance of such a crime. The indictment in this case omitted the statute's "in furtherance of" language, alleging only that King used, carried, and possessed a firearm "during and in relation to" drug trafficking. King argues that this impermissibly relaxed the nexus to trafficking required for conviction under the statute.

Given the rigorous plain error standard, King cannot prevail. An error qualifies as "plain" only if it contravenes "the settled law of the Supreme Court or this circuit." *United States v. Reid*, 523 F.3d 310, 316 (4th Cir. 2008) (internal quotation omitted). King has not pointed to, nor has our research revealed, any binding precedent supporting his claim that the language omitted from the indictment creates plain error.[3] In fact, our sister circuits disagree on whether an indictment's mixing of the elements of § 924(c)'s "use and carry" and "possession" prongs constitutes reversible error. *Compare United States v. Combs*, 369 F.3d 925, 933 (6th Cir. 2004) (reversing conviction because the indictment "confused the elements" of § 924(c)'s prongs) *with United States v. Harvey*, 484 F.3d 453, 456-57 (7th Cir. 2007) (affirming conviction); *United States v. Avery*, 295 F.3d 1158, 1174-76 (10th Cir. 2002) (same). Given the dearth of binding authority, King cannot possibly demonstrate plain error.

Accordingly, King's challenges to the indictment fail.

## B.

King additionally maintains that his convictions on Counts One and Three rest on insufficient evidence. In assessing sufficiency of the evidence, we affirm if, "viewing the evidence in the light most favorable to the prosecution, the verdict is supported by 'substantial evidence.'" *United States v. Smith*,

---

[3]In the course of rejecting a challenge to jury instructions, we remarked in an unpublished opinion that § 924(c) "creates distinct 'use and carry' and 'possession' offenses" and so if a defendant is "indicted for one § 924(c) offense but convicted of the other, this would of course mandate reversal under our precedent." *United States v. Woods*, 271 F. App'x 338, 343 (4th Cir. 2008). Because *Woods* dealt with the mismatch between a jury instruction and an admittedly sufficient indictment, we had no opportunity to assess the sufficiency of an indictment that intermixes § 924(c)'s elements. Moreover, this unpublished non-precedential opinion can establish no basis for a finding of plain error. *See United States v. Stewart*, 595 F.3d 197, 199 n.1 (4th Cir. 2010).

451 F.3d 209, 216 (4th Cir. 2006) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). "Substantial evidence" consists of "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* (quoting *Burgos*, 94 F.3d at 862). Throughout our review, we "assume that the jury resolved any conflicting evidence in the prosecution's favor." *United States v. Jeffers*, 570 F.3d 557, 565 (4th Cir. 2009).

1.

King argues that we should reverse his conviction on Count One for possession with intent to distribute cocaine, heroin, and marijuana because the jury unreasonably concluded that the evidence established intent to distribute marijuana. He points out that at trial the police officers admitted that the quantity of marijuana found in his Greenville apartment was consistent with personal use and that they found no marijuana packaging material.

This argument also fails. This is so because of the overwhelming evidence—including King's own admissions—of his intent to distribute illegal narcotics. Indeed, the police seized from King's bedroom 426 plastic bags of cocaine, seven dosage units of heroin, cutting agent, and three firearms, one of which was found close to the bag of marijuana. After his arrest, King admitted ownership of the cocaine, heroin, cutting agent, and firearms, and he later testified that he intended to distribute the cocaine. This undisputed evidence of King's cocaine trafficking "tended to show the existence of a continuing narcotics business and therefore to show [King's] knowledge of the drug trade." *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004). From this evidence of King's participation in the drug trade, the jury could draw an inference that King intended to sell all of the drugs in his possession—including the marijuana.[4] *See United States v.*

---

[4]We also note that the police found no paraphernalia or other evidence indicative of personal marijuana use in King's apartment.

*Rooks*, 596 F.3d 204, 211 (4th Cir. 2010). The presence of the firearm next to the marijuana further supports this inference of distribution. *See United States v. Fisher*, 912 F.2d 728, 731 (4th Cir. 1990).

Accordingly, although a small amount of marijuana found alone would not itself justify a finding of distribution, *see United States v. Fountain*, 993 F.2d 1136, 1138-39 (4th Cir. 1993), the evidence in this case, when viewed in the light most favorable to the Government, suffices to sustain the jury's verdict.

2.

Sufficient evidence similarly supports King's conviction on Count Three for violation of § 924(c), use of a firearm in a drug offense. We have made clear that "there are many factors that might lead a fact finder to conclude that a connection existed between a . . . firearm and . . . drug trafficking activity." *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002). These include the "type of weapon," "the status of the possession (legitimate or illegal)," and the firearm's "proximity to drugs." *Id.* (internal quotation omitted).

All three of these factors support the jury's verdict on Count Three in this case. First, all of the firearms were handguns and so uniquely suited for drug transactions. *See United States v. Lipford*, 203 F.3d 259, 267 n.7 (4th Cir. 2000). Second, King admitted that he knew his prior felony conviction barred him from legally possessing firearms. Third, King stored the firearms in the same room as the drugs, and one gun rested on the headboard of the bed next to the marijuana. Based on this evidence, the jury was entitled to conclude that King possessed the firearms in furtherance of his drug trafficking crimes.

III.

Finally, we turn to King's challenge to Count Five (possession of a firearm by a convicted felon), the only conviction

growing out of the Wilmington search. Throughout this case, King has steadfastly contended that the gun (and other contraband) in the Wilmington apartment belonged not to him, but to Bilal. And King has repeatedly asked the Government to reveal its information about Bilal, which King believes will substantiate his claim. King maintains that the Government's failure to do so violates *Brady v. Maryland*, 373 U.S. 83 (1963), which requires a court to vacate a conviction and order a new trial if it finds that the prosecution suppressed materially exculpatory evidence. To secure relief under *Brady*, a defendant must: (1) identify the existence of evidence favorable to the accused; (2) show that the government suppressed the evidence; and (3) demonstrate that the suppression was material. *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003). The burden of proof rests with the defendant. *See United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001). In reviewing the district court's denial of King's *Brady* motion, we review its legal conclusions *de novo* and its factual findings for clear error. *Walker v. Kelly*, 589 F.3d 127, 140 (4th Cir. 2009).

A.

King first contends that the prosecution violated *Brady* by failing to timely disclose Bilal's arraignment on drug trafficking charges in New York, Bilal's alleged perjury at his brother's assault trial, and Bilal's statement to the New York District Attorney that he "wasn't involved in anything down [in North Carolina]." King's assertions on these points fall short of establishing a basis for finding a *Brady* violation. Even if we were to assume the materiality of this evidence, King fails to demonstrate that the Government suppressed it.

The prosecutor consistently stated that she kept defense counsel apprised of Bilal's activities in New York. That King's *trial* counsel could not recall receiving this information does not cast doubt on the prosecutor's representation because, as the prosecutor explained, she informed one of

King's *pretrial* attorneys, who represented him at the time the information surfaced. We recognize that some information may have failed to reach King's trial counsel, given that King changed attorneys three times and that his escape from custody forced the court to reschedule the trial. But the Government need only *disclose* exculpatory evidence, not ensure that the defense further develop and utilize that evidence. *See Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002).

### B.

The Government, however, does not dispute that it refused to disclose Bilal's grand jury testimony. Indeed, the record is clear that the Government specifically rebuffed both King's written and oral demands that it disclose that testimony and the district court's suggestion that it do so. The Government explained its refusal to turn over the testimony by observing that it "would need a court order" to reveal grand jury testimony. Although the district court apparently offered to provide such an order, the court declined to compel disclosure, reasoning that "I don't know what's in the testimony regarding Mr. Bilal and we have to rely on the government's good faith in these situations." Here, the court erred.

Normally, of course, a defendant must specifically prove the materiality of suppressed evidence, demonstrating "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (internal quotation omitted). This materiality requirement ensures that "*Brady* obligations do not become unduly burdensome" and guards against the conversion of *Brady* rights into a "full-scale, constitutionally-mandated discovery right for criminal defendants." *Monroe*, 323 F.3d at 316 (internal quotation omitted).

But a defendant cannot demonstrate that suppressed evidence would have changed the trial's outcome if the Govern-

ment prevents him from ever seeing that evidence. This problem only rarely plagues *Brady* cases, which typically involve a defendant's post-trial discovery of evidence that the government has assertedly suppressed. *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (noting that *Brady* violations usually involve "the discovery, after trial of information which had been known to the prosecution but unknown to the defense").

In a few atypical cases, however, "it is impossible to say whether" requested information "may be relevant to [a] claim of innocence." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987). In those cases, in which "an accused cannot possibly know, but may only suspect, that particular information exists which meets [the *Brady*] requirements, he is not required . . . to make a particular showing of the exact information sought and how it is material and favorable." *Love v. Johnson*, 57 F.3d 1305, 1313 (4th Cir. 1995). In such circumstances, a defendant need only "make some plausible showing" that exculpatory material exists. *Ritchie*, 480 U.S. at 58 n.15; *Love*, 57 F.3d at 1313. Once he has done so, he becomes "entitled . . . to have the information"—not immediately disclosed to him—but "submitted to the trial court for *in camera* inspection" to determine if in fact the information is *Brady* material subject to disclosure. *Love*, 57 F.3d at 1313; *see also Ritchie*, 480 U.S. at 58. In making the requisite "plausible showing" of the existence of exculpatory information, a defendant must "identify the requested confidential material with some degree of specificity." *United States v. Trevino*, 89 F.3d 187, 189 (4th Cir. 1996).

In this case, the Government deprived King of any access to the grand jury testimony and so prevented him from specifically proving its materiality. King, however, made the required "plausible showing" of possible exculpatory information by identifying the grand jury transcript of one particular witness—an identification more specific than that which the Supreme Court or we have previously held sufficient to trig-

ger such an *in camera* inspection. *See Ritchie*, 480 U.S. at 60-61 (finding that defendant became entitled to an *in camera* examination of all of a victim's records with Pennsylvania's Children and Youth Services agency); *Love*, 57 F.3d at 1307 (granting *in camera* examination in response to request for "alleged victim's entire file maintained by the Wake County Department of Social Services"). The Government certainly could have granted King's request for this one particular document pertaining to one grand jury witness without embarking on a "groundless fishing expedition[ ]." *Trevino*, 89 F.3d at 192 (quoting *United States v. Zolin*, 491 U.S. 554, 571 (1989)).[5] King thus identified the information sought with sufficient particularity so as to trigger his right to an *in camera* inspection.

Of course, Bilal's grand jury testimony may contain nothing helpful to King. And we are mindful that, as a general matter, evidence that merely impeaches those who do not testify lacks relevance, much less materiality. *See United States v. Sanchez*, 118 F.3d 192, 197 (4th Cir. 1997). King, however, has demonstrated that Bilal's grand jury testimony *could* contain materially favorable evidence. Even though Bilal never testified, he figured prominently in King's trial. King's entire defense to the Wilmington charges turned on persuading the jury that the seized contraband belonged to Bilal. To that end,

---

[5]In *Trevino*, we recognized and followed *Ritchie* and *Love* but found presentence reports "entitled to a greater degree of protection from examination and disclosure" because, in contrast to *Ritchie* and *Love*, no statute authorized their disclosure "to third parties by court order." *Trevino*, 89 F.3d at 191. The Government does not contend that *Trevino* exempts Bilal's grand jury testimony from *in camera* examination. Nor could it, for unlike the records at issue in *Trevino*, but like those in *Ritchie* and *Love*, grand jury transcripts are subject to a statute providing for their *in camera* inspection and disclosure. *See* 18 U.S.C. § 3500(b). Thus, judges have long enjoyed wide discretion to inspect grand jury testimony "where a particular need is shown," *United States v. Bryant*, 364 F.2d 598, 600 (4th Cir. 1966), in part because the *in camera* procedure effectively safeguards the government's interest in the preservation of grand jury secrecy. *See In re Grand Jury Subpoena*, 884 F.2d 124, 126 (4th Cir. 1989).

King testified extensively that Bilal set him up, and defense counsel focused on Bilal's relationship to the Wilmington contraband in both her opening and closing statements. Moreover, it is undisputed that Bilal and King shared the Wilmington apartment and that the police relied heavily on Bilal's statements in determining that the seized contraband belonged to King and not Bilal. Given Bilal's pivotal role in the trial, the district court recognized that "the history of Bilal's relationship with Mr. King here is relevant because it would cast a question on . . . whose drugs were in the apartment."

Accordingly, although the jury disbelieved King's story about Bilal, it remains plausible that Bilal's grand jury testimony contained information that might have affected that disbelief. Indeed, information pertaining to Bilal's history with King and thus his possible motive to ensure King's arrest, evidence of Bilal's firearm ownership, or statements illuminating the tenancy arrangement at the Wilmington apartment all could have provided King important ammunition for his defense. If Bilal's grand jury testimony were to contain revelations regarding any such pivotal subject, it could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler v. Greene*, 527 U.S. 263, 290 (1999) (quoting *Kyles*, 514 U.S. at 435).

In addition, King has made a plausible showing that Bilal's grand jury testimony contained evidence material to his sentence. *See Basden v. Lee*, 290 F.3d 602, 611 (4th Cir. 2002) (noting that *Brady* applies to evidence material to sentencing). The district court, over King's objection, applied an eight-level enhancement premised on King's alleged kidnapping of Bilal. *See* U.S.S.G. §§ 2K2.1, 2A4.1. In applying the enhancement, the court expressly credited Bilal's statements regarding the kidnapping. Bilal's grand jury testimony may have contained evidence that would have materially undermined the plausibility of Bilal's account and thus significantly reduced King's sentence.

## IV.

We therefore vacate King's conviction and sentence with respect to Count Five and remand for the district court's *in camera* inspection of Bilal's grand jury testimony. *Love*, 57 F.3d at 1316. After examining the grand jury transcript, the district court should rule on the materiality and favorability to King of any evidence contained therein, taking any "remedial or other action as is required by its determination." *Id.* We affirm in all other respects.

*AFFIRMED IN PART AND*
*VACATED AND REMANDED IN PART*