**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 13-4298**

───────────

UNITED STATES OF AMERICA,

               Plaintiff - Appellee,

     v.

HAMADA MAKARITA,

               Defendant – Appellant.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (1:12-cr-00223-LMB-1)

───────────

Submitted: October 21, 2013        Decided: June 26, 2014

───────────

Before TRAXLER, Chief Judge, and GREGORY and THACKER, Circuit Judges.

───────────

Affirmed by unpublished per curiam opinion.

───────────

Peter D. Greenspun, Jonathan Shapiro, Mikhail N. Lopez, GREENSPUN SHAPIRO P.C., Fairfax, Virginia, for Appellant. Dana J. Boente, Acting United States Attorney, Danya E. Atiyeh, Special Assistant United States Attorney, Mazen Basrawi, Special Assistant United States Attorney, Gene Rossi, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

───────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant Hamada Makarita ("Appellant") was convicted after a jury trial of one count of conspiracy to illegally dispense controlled substances, five counts of illegally dispensing controlled substances, one count of health care fraud, and one count of aggravated identity theft. He appeals, raising three issues: (1) the district court should have granted his motion for a new trial based on the Government's alleged Brady v. Maryland, 373 U.S. 83 (1963), violations; (2) the evidence presented at trial was insufficient to convict him; and (3) cumulative error deprived him of a fair trial. We have reviewed the record and find no reversible error. Accordingly, we affirm.

## I.

Appellant, a dentist, owned and operated a dental practice in Oakton, Virginia, called "Fixasmile," specializing in cosmetic dentistry. On May 24, 2012, Appellant was charged in a 15-count indictment with one count of conspiring to dispense controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); 12 counts of dispensing controlled substances, in violation of 21 U.S.C. § 841(a)(1) (Counts 2-13); one count of health care fraud, in violation of 18 U.S.C. § 1347 (Count 14); and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count 15).

2

The indictment charged that from 2007 to 2012, Appellant "distributed and dispensed thousands of dosages of scheduled medication, including, but not limited to, Dilaudid, Percocet, Vicodin, Fentanyl, Valium, Xanax, and other prescription pills, to patients, employees, and girlfriends, all without a legitimate dental purpose and beyond the bounds of a dental practice." J.A. 33.* Further, the indictment charged Appellant with fraudulently billing the health care insurance provider, AETNA, for dental services he provided to his family members by billing these services under the name of another dentist.

Appellant's jury trial began on November 5, 2012, and on November 16, 2012, the jury returned guilty verdicts as to Counts 1-3, 10, and 12-15. The jury found Appellant not guilty on the remaining seven specific distribution counts. On April 12, 2013, Appellant was sentenced to 25 months imprisonment.

A.

At trial, the Government's witnesses included, Karen Derder, Appellant's former office manager; Janet Williams, Appellant's current office manager; Janet Brumbaugh, Appellant's patient and former girlfriend; and Masooda Azad, Appellant's former dental assistant. The Government also presented expert

---

* Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

testimony for each of the distribution counts from Dr. Lawrence Singer. Below is a summary of the evidence presented to support each count of conviction.

1.

Count One

Count 1 charged Appellant with conspiracy to illegally dispense controlled substances by directing "employees to pharmacies to pick up filled prescriptions written in the names of employees and patients, and further instruct[ing] the employees to illegally distribute the prescription medications back to him for his personal use and further distribution." J.A. 35. Karen Derder, Appellant's former office manager, testified that on April 23, 2009, she filled a prescription from Appellant for Fentanyl patches and witnessed him apply one of the patches to his body at his dental office. Moreover, Ms. Derder testified that she printed multiple prescriptions for controlled substances from the office computer for Appellant's various family members, patients, and friends at the behest of Appellant.

Masooda Azad, Appellant's former dental assistant, testified that on July 26, 2007, Appellant wrote a prescription for Valium in her name and instructed her to pick up the medication and return it to him so he could distribute it to Reem Hammoud, his girlfriend. Ms. Azad also testified that on

4

January 24, 2008, Appellant wrote a prescription for Vicodin in her name and instructed her to pick it up and return it to him for his own personal use. According to Ms. Azad, she discovered for the first time during the investigation of this case from a Virginia Prescription Monitoring Program ("PMP") report shown to her by a federal agent that Appellant had written several other prescriptions in her name which were filled at various pharmacies. Ms. Azad testified when she called Appellant to ask why federal agents were inquiring into her prescription history, he instructed her to tell the federal agents that he had given her some pain medication. Ms. Azad testified this confused her because the only pain medicine Appellant had given her for her own use had been topical medication for a mouth sore.

2.

Counts Two and Three

Counts 2 and 3 charged Appellant with illegally distributing or dispensing controlled substances to Janet Brumbaugh on November 13, 2007, and January 23, 2008, respectively. Ms. Brumbaugh testified that she began seeing Appellant for dental services in 2002, and her relationship with him became romantic in 2007. According to Ms. Brumbaugh, after their relationship turned romantic, she would call Appellant to get prescriptions for Vicodin and Valium for recreational use, and she would consume these controlled substances as well as

5

alcohol while on dates with Appellant. It was her understanding that, in order to obtain the prescriptions, she had to "hang out" with Appellant. J.A. 551. Ms. Brumbaugh testified that on at least one of these dates she combined the Vicodin with alcohol and blacked out. Either the next day or shortly thereafter, Appellant sent her photographs that he had taken of her while she was incapacitated, which depicted her nude except for a jacket and a single boot, lying apparently unconscious on his bed. The photograph was admitted into evidence. Ms. Brumbaugh further testified that she was suffering from no dental pain at the time and did not tell Appellant she was suffering from any dental pain; the medications were solely for recreational purposes, and Appellant was well aware that she was not using the medications for a legitimate medical purpose.

Dr. Lawrence Singer, the Government's expert, testified that he reviewed Janet Brumbaugh's patient file and in 2007, Ms. Brumbaugh had minor dental procedures performed that would result in "mild discomfort" at most. J.A. 465. Further, after reviewing Ms. Brumbaugh's record from the Virginia PMP, Dr. Singer testified that between 2007 and 2008 Appellant prescribed Ms. Brumbaugh "several hundred pills total" in prescriptions that "were maybe a couple dozen," and Ms. Brumbaugh's patient record was devoid of any clinical notes to support this treatment. J.A. 466. Specifically, Dr. Singer

6

testified that the Vicodin prescriptions Appellant wrote for Ms. Brumbaugh on November 13, 2007, and January 23, 2008, were not written within the bounds of dental practice for a legitimate dental purpose because there were no records, notes, treatment, or anything else in the patient's records to indicate that this treatment was required or even that Ms. Brumbaugh had any dental services performed by Appellant.

### 3.

### Count Ten

Count 10 charged Appellant with illegally distributing or dispensing a controlled substance to Karen Derder on April 23, 2009. Ms. Derder testified Appellant wrote a prescription for several boxes of Fentanyl patches in her name and asked her to fill it for his own personal use. According to Ms. Derder, Appellant hand wrote the prescription, and she dropped it off at a pharmacy the night of April 22, 2009, and picked it up before work the next morning. Ms. Derder testified that upon arriving at work the morning of April 23, 2009, she gave the three boxes of Fentanyl patches to Appellant and witnessed him apply one to his body. Appellant himself corroborated Ms. Derder's account. Appellant testified, "I was hoping this was something I could use as a treatment modality to use for any oral pain. That's why I used it on myself. I said, 'I want to see if it helps my back.'" J.A. 1091.

7

Ms. Derder not only worked for Appellant, but was also his patient. The Government's expert, Dr. Singer, reviewed Ms. Derder patient file and record from the Virginia PMP. Dr. Singer testified that between 2007 and 2012 Appellant wrote prescriptions for Ms. Derder for what "[a]ll amounted to a few hundred -- several hundred doses of narcotics." J.A. 471. Specifically, Dr. Singer testified that on April 23, 2009, Appellant prescribed Ms. Derder Fentanyl patches, which are a "slow-release formulation of Fentanyl" in a patch applied to the skin. J.A. 473. According to Dr. Singer, this medicine is outside the scope of dentistry or oral surgery and "is only appropriate for a chronic pain patient who has cancer pain or . . . something extremely debilitating and may be chronically ill." J.A. 474. Dr. Singer testified that the April 23, 2009 Fentanyl patch prescription Appellant wrote for Ms. Derder was not written within the bounds of dental practice for a legitimate dental purpose because there were no clinical notes in her file that would support this treatment and because Fentanyl has no role in dentistry as it "is a chronic pain medication of the highest order." J.A. 475.

8

## 4.

### Counts Twelve and Thirteen

Counts 12 and 13 charged Appellant with illegally distributing or dispensing a controlled substance to Masooda Azad on July 26, 2007, and January 24, 2008, respectively. Ms. Azad was not only Appellant's dental assistant, she was also his patient. Ms. Azad testified that on two separate occasions, Appellant wrote prescriptions for controlled substances in her name, and then asked her to go to a pharmacy, pick up the medication, and bring it back to him -- once for Reem Hammoud, Appellant's girlfriend, and once for his own use. Ms. Azad testified that the first time she complied, and brought a prescription for Valium back to Appellant. However, she refused to fill the second prescription, which was for Vicodin. Janet Williams, Appellant's current office manager, confirmed that the January 2008 prescription for Vicodin was written in Appellant's handwriting.

Dr. Singer, the Government's expert, again testified that he reviewed Ms. Azad's patient file and record from the Virginia PMP. Dr. Singer testified that there were no clinical notes to support Appellant's prescription of Valium on July 26, 2007. Dr. Singer emphasized that Ms. Azad was not Appellant's patient until approximately a year after this prescription was written. Dr. Singer also testified that there were no records

9

to support Appellant's January 24, 2008 prescription of Vicodin to Ms. Azad. Dr. Singer opined that these prescriptions were not written within the bounds of dental practice for a legitimate dental purpose "[b]ecause there's no treatment, there's no records, and this is a scheduled substance that has a high potential for abuse, so there's no treatment or records to support this or even that the patient was a patient of record at that time." J.A. 462-63.

5.

Counts Fourteen and Fifteen

Counts 14 and 15 charged Appellant with health care fraud for billing AETNA, a health care insurance provider, for services he provided to his family members and for aggravated identity theft, respectively. A representative from AETNA, Kathy Richer, testified that AETNA has an administrative services contract with World Bank. According to Ms. Richer, this means that World Bank pays their own employees' claims, but AETNA administers the contract or coverage policy and pays claims according to the plan's guidelines. In other words, an employee's insurance "claim is submitted by a provider, and [AETNA] pay[s] the claim, but it's actually World Banks's money that's paying the claim." J.A. 403. After reviewing the medical insurance plan between World Bank and its employees and the contract between World Bank and AETNA, Ms. Richer testified

10

that there is a specific exclusion in the documents "stating that services cannot be rendered to any family member or person related by blood or marriage" by a provider. J.A. 404; see also J.A. 1266.

From 2007 to 2012, World Bank's AETNA-administered heath insurance plan provided dental insurance to Appellant's parents. Karen Derder, Appellant's former office manager, and Janet Williams, Appellant's current office manager, both testified that Appellant was aware of a provision in his parent's health insurance plan that excluded from reimbursement procedures performed on a patient by a doctor or dentist who was that patient's family member. The two also testified that in order to circumvent this provision, Appellant submitted his requests for reimbursement for work done on his parents in the name of Dr. Sameh Kassem, a dentist who had previously been employed by the practice. Ms. Williams and Ms. Derder both testified that when checks arrived from AETNA made out to Dr. Kassem, Appellant would forge Dr. Kassem's signature in order to sign the check over to himself, and then deposit the check, sometimes in his personal bank account and sometimes in the business bank account. Dr. Kassem testified and confirmed that the signatures on the checks were not his, that he had not authorized Appellant to bill in his name or to sign checks on his behalf, and that he had not performed any dental work on

Appellant's parents. According to Ms. Richer, Appellant received approximately $91,000 to which he was not entitled by engaging in this particular billing practice.

B.

After trial, Appellant filed motions for acquittal and for a new trial. These motions alleged the Government committed a number of Brady v. Maryland, 373 U.S. 83 (1963), discovery violations. Specifically, Appellant claimed the Government failed to inform him that Karen Derder believed that in exchange for her testimony in this case, Special Agent Parker, the federal agent investigating this case, would protect her from prosecution on unrelated charges for embezzlement in Culpeper County, Virginia. Appellant further claimed the Government failed to disclose the result of a negative drug test performed by Pre-Trial Services on Appellant the day of his arrest. Finally, Appellant argued the Government was required to subpoena Ms. Derder's bank records and provide them to him. The district court held two post-trial evidentiary hearings before ultimately denying Appellant's motions.

Although the Government did not present any evidence in response to Appellant's latter two arguments, i.e., the negative drug test and Ms. Derder's bank records, it argued to the district court that it had neither in its possession and, therefore, the evidence could not be considered Brady evidence.

12

The Government argued that the drug test did not fall under the purview of Brady because Appellant's counsel had actual knowledge of the negative result from Appellant himself and the result of the test was not within the control of the Government. The Government also argued that Ms. Derder's bank records were not subject to Brady because they were also not in its control. Further, according to the Government, the bank records would have been cumulative impeachment material.

With regard to the Culpeper investigation, Special Agent Parker testified at the first post-trial hearing on March 15, 2013, that he had instructed Ms. Derder to cooperate and be truthful with the Culpeper investigators in order to be protected under her immunity agreement with the government. On cross-examination, Special Agent Parker admitted that Ms. Derder likely believed "that truthful equaled no prosecution." J.A. 1431. However, Ms. Derder testified that she believed that her federal immunity agreement in this case would not affect the Culpeper investigation at all "[b]ecause the federal immunity only applied to the trial of [Appellant]. It doesn't apply to any context outside of that." J.A. 1506. Further, Detective Maria Rodriguez, a detective for the Culpeper County Sheriff's Office and the detective who investigated the embezzlement accusations against Ms. Derder, testified that the federal case had no impact on her actions with regard to the investigation.

13

At the close of the second hearing, the district court denied Appellant's motions. With regard to Appellant's motion for a new trial, the district court stated,

> the ultimate question about whether or not to grant a new trial is has there been a manifest injustice, has an innocent person been wrongly convicted, and you don't lightly set aside a trial unless there are some really significant problems such that if you look at the entire record, not just one little piece here and one little piece there in isolation, if you look at the entire record, does it suggest that there was, in fact, so many defects that the case itself has to be retried.

J.A. 1590. Ultimately, the district court concluded Appellant's alleged <u>Brady</u> violations did not meet this standard.

> [M]ost of the issues that you have taken up in my view have to do with credibility and at most would have been cumulative of the significant amount of evidence that the . . . defense was able to present that would undermine the credibility of not just Derder but of the agent as well.
>     And, you know, again, [Appellant's counsel] put on very effective cross-examination of all the [G]overnment's witnesses, and they all had [a] certain amount of warts, but overall between the documentary evidence that was at the trial and the testimony of the witnesses, I think there is no basis to grant the motion for a new trial. So I'm denying the motion . . . .

J.A. 1612.

The defendant now appeals to this Court.

14

Appellant first argues the district court erred by denying his motion for a new trial based on the Government's alleged Brady v. Maryland, 373 U.S. 83 (1963), violations. Rule 33 of the Federal Rules of Criminal Procedure provides, such a motion may be granted "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "We review the district court's denial of a motion for a new trial under an abuse of discretion standard." United States v. Bartko, 728 F.3d 327, 334 (4th Cir. 2013). "It is an abuse of discretion for the district court to commit a legal error -- such as improperly determining whether there was a Brady violation -- and that underlying legal determination is reviewed de novo." Id. at 338.

Brady held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. To succeed on his Brady claim, "the burden rest[s] on [Appellant] to show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, i.e., prejudice must have ensued; and (3) that the prosecution had materials and failed to disclose them." Bartko, 728 F.3d at 338 (internal quotation marks omitted).

15

Appellant argues the Government violated Brady when it (1) failed to provide information about Karen Derder's understanding of her federal immunity agreement; (2) failed to produce the result of Appellant's negative drug test; and (3) failed to provide bank records showing Ms. Derder's health care fraud.

A.

Federal Immunity Agreement

According to Appellant, the Government suppressed favorable, material evidence as to Karen Derder's understanding of her federal immunity agreement. Appellant characterizes Ms. Derder as a serial perpetrator of frauds and the Government's key witness against him. Appellant contends that at the time of the trial, Ms. Derder was under strong suspicion by state authorities in Culpeper, Virginia, for embezzlement from her daughter's basketball team fund. Appellant further asserts this embezzlement occurred well after Ms. Derder reached her cooperation agreement with the Government, which provided her immunity from federal prosecution for her drug and fraud crimes. According to Appellant, as developed in the post-trial hearings, it was made clear to Ms. Derder by Special Agent Parker that as long as she cooperated with the Culpeper authorities, she was protected from prosecution from the potential charges in Culpeper. Appellant argues that this understanding was withheld

16

from him, and he was not permitted to pursue questions relating to it on cross examination.

The Government disputes Appellant's allegations claiming they did not suppress the evidence because it did not exist. According to the Government, Ms. Derder had no belief that she would be protected from prosecution by the Culpeper authorities. The Government further argues that even if Ms. Derder possessed some undisclosed perceived benefit, it did not violate Brady because the evidence was not material as it would have been cumulative impeachment of a witness whose credibility had already been thoroughly challenged.

It is well settled law that "[i]mpeachment evidence, . . . as well as exculpatory evidence, falls within the Brady rule. Such evidence is evidence favorable to an accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." United States v. Bagley, 473 U.S. 667, 676 (1985) (internal quotation marks and citations omitted). Additionally, "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." Giglio v. United States, 405 U.S. 150, 154 (1972) (internal quotation marks omitted). To succeed on his claim, however, Appellant must still show the suppressed, favorable evidence is material. See id. Materiality exists

17

under the Brady rule "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (internal quotation marks omitted).

Appellant's argument with respect to Karen Derder's federal immunity agreement fails for two reasons. First, Ms. Derder specifically testified at the post-trial hearings that she had no belief she would be protected from prosecution in the Culpeper matter "[b]ecause the federal immunity only applied to the trial of [Appellant]." J.A. 1506. Second, even assuming Ms. Derder had the requisite belief and the Government suppressed it, Appellant's argument nonetheless fails as to materiality. Appellant failed to demonstrate that there is a reasonable probability that the outcome of the trial would have been different had the defense been able to impeach Ms. Derder using this additional material.

Appellant's counsel conducted a thorough cross examination of Ms. Derder. For example, Appellant's counsel impeached her on the following:

- She was terminated by Appellant for making a false claim to an insurance company in 2010;

18

- She submitted a false resume to a doctor in Manassas, Virginia, in 2010;

- She billed an insurance company fraudulently for work not done on a patient and received the money herself for personal use;

- She forged Appellant's signature on prescriptions;

- She made inconsistent statements to the grand jury;

- She made fraudulent insurance claims on behalf of her sister;

- She was convicted of writing false checks in 1991; and

- She allegedly embezzled from Appellant's 401(k) plan.

Thus, as the district court pointed out in its ruling, Ms. Derder was zealously impeached with a variety of material, and this alleged additional area of impeachment, even if it did exist, would have simply been cumulative. Therefore, Appellant's claim fails because there is not a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.

## B.

### Drug Test and Bank Records

Next, Appellant argues the Government violated Brady when it failed produce the result of a negative drug test,

19

undermining its theme that Appellant abused drugs, and when it failed to produce Karen Derder's bank records. According to Appellant, the Pre-Trial Services drug test taken on the day of Appellant's arrest was negative, but the Government failed to provide the defense with this exculpatory evidence until the close of evidence. The jury was eventually given this information in the form of a jury instruction from the court. However, the Government had suggested throughout the trial that Appellant had Vicodin or hydrocodone in his system when he was arrested. Furthermore, Appellant contends the Government should have produced Ms. Derder's bank records. Instead, Appellant was forced to subpoena the records himself, which he did not receive until the eve of closing argument.

The Government argues that the drug test was not in the possession or control of the Government or any member of the trial team, and it did not have the test result in its file. Special Agent Parker mistakenly testified (and mistakenly told Appellant during his arrest) that the test was performed by the United States Marshals. According to the Government, the test was actually performed at the courthouse by Pre-Trial Services, an arm of the court, and it was not aware of the result; and therefore, according to the Government, it had no duty to disclose the result. Additionally, the Government argues Ms. Derder's bank records were also not in its possession, and the

Government is not required to affirmatively seek out information not already in its possession and deliver it to the defendant.

Appellant's claims with regard to the drug test and Ms. Derder's bank records fail for the fundamental reason that Appellant failed to demonstrate "that the prosecution had [the] materials and failed to disclose them." Bartko, 728 F.3d at 338. Brady does not require the Government to investigate the defense's theory of the case or create evidence that might be helpful to the defense. This fundamental element of Brady requires Appellant to show that the Government "suppressed" the evidence in question, either willfully or inadvertently. See United States v. King, 628 F.3d 693, 701-02 (4th Cir. 2011). Simply, "[s]uppressed evidence is 'information which had been known to the prosecution but unknown to the defense.'" Spicer v. Roxbury Corr. Inst., 194 F.3d 547, 557 (4th Cir. 1999) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)). Neither the drug test result nor Ms. Derder's bank records were suppressed by the Government as they were not information known to the prosecution but unknown to the defense. The Government is only obligated to disclose favorable evidence in its possession. Therefore, Appellant's claim here fails.

Moreover, the district court gave a curative instruction to the jury concerning the result of Appellant's drug test. The district court's instruction informed the jury

21

of the negative result of Appellant's drug test and instructed them to disregard any testimony provided by federal agents that made reference to and suggested Appellant had Vicodin or hydrocodone in his system when he was arrested. Even if an inadvertent Brady violation had occurred, the district court's curative instruction properly cured any potential prejudicial effect. There is, therefore, no reasonable probability that a different verdict would have been resulted.

                                III.

Appellant additionally maintains that his convictions rest on insufficient evidence. "We review the sufficiency of the evidence de novo. A defendant bringing a sufficiency challenge must overcome a heavy burden, and reversal for insufficiency must be confined to cases where the prosecution's failure is clear." United States v. McLean, 715 F.3d 129, 137 (4th Cir. 2013) (internal quotation marks and citations omitted). We "affirm the jury verdict when, 'viewing the evidence in the light most favorable to the prosecution, [it] is supported by 'substantial evidence,'" United States v. Hager, 721 F.3d 167, 179 (4th Cir. 2013) (quoting United States v. King, 628 F.3d 693, 700 (4th Cir. 2011)). "Substantial evidence consists of evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." King, 628 F.3d at

22

700 (internal quotation marks omitted). "As both the Supreme Court and this Court have recognized, appellate reversal on grounds of insufficient evidence will be confined to cases where the prosecution's failure is clear.'" Hager, 721 F.3d at 179 (internal quotation marks and alterations omitted).

A.

Controlled Substances Convictions

Appellant argues there was insufficient evidence to support his conviction for conspiracy because the evidence failed to demonstrate any agreement to illegally distribute controlled substances between him and any other individual. Appellant contends that although the conspiracy allegations centered on Masooda Azad and Karen Derder, there was never any agreement between the alleged members of the conspiracy. To the contrary, the Government argues the evidence was sufficient to convict Appellant of conspiracy because both Ms. Azad and Ms. Derder testified they agreed to pick up prescriptions for Appellant.

To prove a conspiracy, the Government must present evidence of an agreement between two or more persons to illegally distribute controlled substances. See United States v. Burgos, 94 F.3d 849, 860 (4th Cir. 1996) (en banc). "The presence of a knowing and voluntary agreement distinguishes conspiracy from the completed crime and is therefore an

23

essential element of the crime of conspiracy." <u>United States v. Hackley</u>, 662 F.3d 671, 679 (4th Cir. 2011).

Here, viewing the evidence in the light most favorable to the prosecution, Appellant's conviction for conspiracy is supported by substantial evidence. Testimony from both Ms. Derder and Ms. Azad established that Appellant entered into an agreement with each of them to pick up prescriptions in their own names and deliver them to Appellant, either for him to illicitly deliver to others, or for his own personal use. Although Appellant's testimony contradicted the testimony of Ms. Derder and Ms. Azad, the jury elected to credit their testimony over Appellant's. We find no reason to overturn this reasonable determination by the finder of fact.

Appellant also claims there was insufficient evidence to support his distribution offenses. However, after a careful review of the record, we conclude substantial evidence clearly supports that Appellant distributed and dispensed a variety of controlled substances for recreational purposes and not for a legitimate medical and dental purpose. Therefore, Appellant's argument is without merit.

B.

Health Care Fraud Conviction

As previously explained, Appellant performed dental work for his parents and submitted insurance claims for

24

reimbursement to their medical insurance plan from World Bank, which was administered by AETNA, but he submitted the claims in the name of Dr. Kassem rather than in his own name. According to the Government, Appellant submitted claims in Dr. Kassem's name because he believed, based on his understanding of the plan provisions, that AETNA would not reimburse him unless he misrepresented that the work was performed by a non-family member. By doing so, Appellant received reimbursement checks to which he was not entitled. This formed the basis for Appellant's conviction for health care fraud.

Appellant challenges this conviction by first arguing there was insufficient evidence because the Government failed to prove that Appellant was a party to the AETNA contract. According to Appellant, because he was not a party to the contract, he was not bound by its terms that excluded reimbursement for work performed on family members. Without this foundation, Appellant argues the evidence could not establish that he formed the specific intent to defraud AETNA. We are not persuaded by this line of argument.

The health care fraud statute pursuant to which Appellant was convicted makes it a crime to "knowingly and willfully execute[], or attempt[] to execute, a scheme or artifice . . . to defraud a health care benefit program." 18 U.S.C. § 1347(a)(1); see also McLean, 715 F.3d at 136. "The

25

specific intent to defraud may be inferred from the totality of the circumstances, and need not be proven by direct evidence." McLean, 715 F.3d at 140.

After careful review of the record, we conclude there was substantial evidence to support Appellant's conviction for health care fraud. As an initial matter, whether Appellant was a party to the insurance contract or not is not relevant to whether he formed the specific intent to commit health care fraud. Indeed, the fraud occurred when Appellant submitted a claim for reimbursement in the name of Dr. Kassem when in reality Appellant himself performed the dental work. Based on the plan itself and the testimony of Kathy Richer, it was evident that the AETNA/World Bank plan excluded "services furnished by persons who are related to insured person in any way by blood or marriage." J.A. 1266. The testimony of both Karen Derder and Janet Williams established that Appellant was aware of this provision, and to circumvent it, he deliberately submitted claim forms for his parents to appear as though the work he performed had been performed by Dr. Kassem. Additionally, both Ms. Derder and Ms. Williams testified that Appellant received checks made out to Dr. Kassem and signed them over to himself. The evidence was more than sufficient to show that Appellant made the false representations to AETNA knowingly

26

and willfully, in order to receive money to which he was otherwise not entitled.

Appellant further argues the evidence failed to demonstrate that AETNA was a health care benefit program. We disagree.

A "health care benefit program" is defined by the statute as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual." 18 U.S.C. § 24(b). After a review of the record, we conclude, there was substantial evidence to establish AETNA was a health care benefit plan under the statute. The evidence showed AETNA was the agent of World Bank for purposes of administering its health care plan, which was a public or private plan or contract, affecting commerce, under which any medical benefit, item, or service was provided to individuals. Substantial evidence demonstrated that the AETNA/World Bank plan provided health insurance coverage to the plan participants, that AETNA administered that plan, acting as World Bank's agent, and that AETNA received the fraudulent insurance claims submitted by Appellant. Therefore, we conclude that, viewing the evidence in the light most favorable to the prosecution, Appellant's conviction for health care fraud is supported by substantial evidence.

27

## C.

After careful review of the record, we further conclude Appellant's claim of cumulative error based on the district court's admission of a semi-explicit photograph and on the district court's limitation on the amount of cumulative patient witnesses Appellant could call is without merit.

## IV.

For the foregoing reasons, the judgment of the district court is affirmed. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

AFFIRMED